## In re FAIRFIELD EXECUTIVE ASSOCIATES, Debtor.

## FAIRFIELD EXECUTIVE ASSOCIATES, Appellant,

### v.

## HYPERION CREDIT CAPITAL PARTNERS, L.P., Respondent.

**Bankruptcy No. 92–29554 (NLW).**

**Civ. A. No. 93–1528.**

United States District Court,
D. New Jersey.

Nov. 1, 1993.

Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ by Nancy Isaacson for Fairfield Executive.

Herrick & Feinstein P.C., Princeton Junction, NJ by Robin J. Kantor for Hyerior Credit Capital Partners.

## OPINION

HAROLD A. ACKERMAN, District Judge:

This matter comes before the court on the appeal of a debtor in bankruptcy from an order of the United States Bankruptcy Court granting the motion of a creditor for relief from the bankruptcy automatic stay. For the following reasons, the decision of the bankruptcy court is affirmed in its entirety.

### I. Factual Background

Fairfield Executive Associates ("Fairfield" or "Debtor") is a New Jersey general partnership which owns and is engaged in the business of operating an office building located in Fairfield, New Jersey (the "Property"). Fairfield purchased the Property on August 25, 1985 for $8,300,000. On November 24, 1987, Fairfield obtained a loan in the amount of $13,000,000, plus interest, from Security Capital Credit Corporation ("SCCC"). The loan was evidenced by a secured promissory note (the "Note") and was secured by a first priority purchase money mortgage on the Property (the "Mortgage").

In late 1991 and early 1992, the Property's occupancy rate dropped from 100% to 50%. As a result, the rental income generated by the Property was inadequate to enable Fairfield to meet all the expenses of operating the Property. In August, 1991, Fairfield defaulted under the Note and Mortgage.

Thereafter, SCCC was taken over by the Resolution Trust Corporation ("RTC"). By assignment dated January 27, 1992, Hyper-

ion Credit Capital Partners, L.P. ("Hyperion") acquired SCCC's entire loan portfolio, including the Fairfield loan, at a discount.[1]

Fairfield and Hyperion attempted to restructure the terms of the loan. Efforts at negotiation failed and, on November 12, 1992, Hyperion commenced a foreclosure action in the Superior Court of New Jersey, seeking the appointment of a temporary receiver for the Property.

On November 23, 1992, two days before Hyperion's motion for the appointment of a receiver was to be heard, Fairfield filed a voluntary petition in bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey. Pursuant to 11 U.S.C. § 362(a), the filing of the petition operated as a stay of the foreclosure proceedings.[2]

In its bankruptcy petition, Fairfield listed Hyperion's claim as a secured claim in the approximate amount of $13,000,000. The Property was listed as having a value of approximately $8,350,000. Fairfield also listed claims of general unsecured trade creditors, whose claims aggregated approximately $65,000.

On December 10, 1992, Hyperion made a motion before the bankruptcy court, Honorable Novalyn L. Winfield presiding, to dismiss the petition, or in the alternative, for relief from the automatic stay under 11 U.S.C. § 362.[3] A hearing on the motion was held January 11, 1993. However, because the Debtor had not yet provided a plan of reorganization, the court adjourned the hearing.

On February 24, 1993, Fairfield filed an application for an order compelling discovery. Specifically, Fairfield sought to ascertain the amount Hyperion paid for the SCCC loan

---

1. Despite Fairfield's attempts for discovery, Hyperion has refused to disclose the price it paid for the SCCC portfolio or for the Fairfield loan. Hyperion concedes, however, that it obtained the loan at a discount.

2. Fairfield has continued in possession and management of the Property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3. Hyperion moved to dismiss Fairfield's bankruptcy petition pursuant to 11 U.S.C. § 1112(b) on the ground that it was filed in bad faith. Judge Winfield, however, did not reach this aspect of Hyperion's motion.

portfolio, and the amount of the purchase price allocated to the Fairfield loan.

On February 28, 1993 Fairfield filed a disclosure statement and a proposed plan of reorganization ("Plan"). The disclosure statement listed Hyperion's claim as approximately $13,000,000 and listed the fair market value of the property as $8,500,000. Because Hyperion's claim was undersecured, the disclosure statement and Plan divided the claim, in accordance with 11 U.S.C. § 506(a), into a secured claim in the amount of $8,5000,000, and an unsecured deficiency claim of approximately $5,000,000.[4]

The Plan also proposed to create three classes of claims that are relevant to this appeal. Class 4 consisted of the secured portion of Hyperion's claim. Class 5 consisted of the claims of all the general unsecured creditors, other than Hyperion's unsecured claim; these were estimated to total $62,623. Finally, Class 7 consisted of Hyperion's unsecured deficiency claim of approximately $5,000,000. Although classified separately, the Plan provided for identical payments on Hyperion's deficiency claim and the claims of the unsecured trade creditors. Specifically, the Plan proposed to pay Class 5 and Class 7 22% of the allowed claims, 2% on the effective date of the Plan and 5% on the first through the fourth anniversaries of the effective date.

The Plan also indicated that to the extent funds were needed to confirm the Plan, the Debtor's principals would contribute up to $500,000. In exchange for this capital contribution, the Plan provided that the Debtor's principals would continue to retain their ownership of the Property.

On March 2, 1993, the bankruptcy court conducted a hearing on Fairfield's and Hyperion's motions. The bankruptcy court first addressed Fairfield's application for discovery relating to what Hyperion had paid for the Fairfield loan. Fairfield argued that because Hyperion purchased the loan at a dis-

count, Hyperion's claim should be limited to the amount of the purchase price, rather than the face amount of the loan. The bankruptcy court rejected this argument, holding that the fact that Hyperion purchased the loan at a discount did not change the nature of the Debtor's obligation and did not provide a reason for treating Hyperion's claim differently from that held by an original holder. The court therefore determined that the discovery sought by Fairfield was not relevant to the issues raised by Hyperion's motion for stay relief and denied the discovery application.

The court next addressed Hyperion's motion for relief from the stay. Hyperion argued that it was entitled to relief under 11 U.S.C. § 362(d)(2) because the Plan improperly placed Hyperion's unsecured deficiency claim and the unsecured claims of the trade creditors into separate classes and consequently could not be confirmed. The bankruptcy court, relying on the Third Circuit's recent decision in *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Associates*, 987 F.2d 154, 156 (3d Cir.1993), *reh'g denied en banc*, 987 F.2d 154 (3d Cir.1993), agreed and granted Hyperion's motion. This appeal followed.

## II. Jurisdiction and Standard of Review

■ Section 158(a) provides in pertinent part:

The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges.

11 U.S.C. § 158(a). The Third Circuit has adopted a pragmatic approach to determining finality of orders in bankruptcy cases. *Route 37*, 987 F.2d at 157 (*citing In re Market Square Inn, Inc.*, 978 F.2d 116 (3d Cir.1992)). A bankruptcy court's order granting relief from the automatic stay constitutes a final order for purposes of appeal.

---

4. Section 506(a) provides in pertinent part that [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an

unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506(a); *see Sapos v. Provident Inst. of Sav.*, 967 F.2d 918, 921 (3d Cir.1992).

*See In re Comer*, 716 F.2d 168, 172 (3d Cir.1983) (order lifting stay was final where it completed litigation on the question and subjected property to a foreclosure action in state court). This court therefore has jurisdiction to hear this appeal pursuant to 11 U.S.C. § 158(a).

■ The bankruptcy court's factual determinations are reviewed under a clearly erroneous standard. Questions of law are subject to plenary review. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989); *In re Jersey City Medical Center*, 817 F.2d 1055, 1059 (3d Cir.1987). The propriety of the classification of claims is subject to *de novo* review. *In re Lumber Exchange Building Limited Partnership*, 968 F.2d 647, 649 (8th Cir.1992).

## III. Discussion

### A. Background

#### 1. Relief from Automatic Stay

■ At issue in this case is whether Hyperion is entitled to relief from the automatic stay under Section 362(d)(2). Pursuant to Section 362(d)(2), a creditor is entitled to relief "with respect to a stay of an act against property," such as foreclosure, if:

(A) the debtor does not have an equity in such property;

and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2); *see Route 37*, 987 F.2d at 157. The creditor has the burden of proving that the debtor lacks equity in the property while the debtor has the burden of proving that the property is necessary for an effective reorganization. 11 U.S.C. § 362(g); *see United Sav. Ass'n v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). For purposes of this appeal, it is not disputed that Fairfield has no equity in the Property. Therefore the only remaining question is whether the Property is necessary for an effective reorganization.

■ In order to satisfy this requirement, the debtor must show that there is "a reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 484 U.S. at 376, 108 S.Ct. at 633 (citation omitted). As the Third Circuit in *Route 37* observed, "while 'a lift stay hearing should not be transformed into a confirmation hearing,' '[t]he effective reorganization requirement enunciated by the Supreme Court ... require[s] a showing by a debtor ... that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed.'" *Route 37*, 987 F.2d at 157 (*quoting In re 266 Washington Associates*, 141 B.R. 275, 281 (Bankr.E.D.N.Y. 1992), *aff'd*, 147 B.R. 827 (E.D.N.Y.1992)). Thus, a creditor is entitled to "relief from the automatic stay if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations." 2 *Collier on Bankruptcy*, ¶ 362.07 at 362–62. Similarly, a creditor is entitled to stay relief where the proposed plan violates the requirements for confirmation. *See Route 37*, 987 F.2d at 157.

#### 2. Plan Confirmation

Section 1129 sets forth two methods for confirming a plan of reorganization. Under the first method, a plan may not be confirmed unless it is approved by each "impaired" class of claims. 11 U.S.C. § 1129(a)(8). Under the second method, known as the "cramdown" method, only one impaired class must approve the plan. 11 U.S.C. § 1129(a)(10).[5] A class is deemed to have accepted a plan if members who hold "at least two-thirds in amount and more than one-half in number of the allowed claims" vote to accept the plan. 11 U.S.C. § 1126(c). Here, it is undisputed that Hyperion will not approve a plan unless the plan provides for either payment of Hyperion's claim in full or surrender of the Property. Because there is insufficient money in the estate to pay Hyperion's claim and because of Hyperion's op-

**5.** Under the cramdown method, the debtor must also satisfy the requirements of Section 1129(a), other than approval by all impaired classes, as well as the requirements of Section 1129(b), that is, the plan must not "discriminate unfairly" against and must be "fair and equitable" with respect to all impaired classes that do not approve the plan. 11 U.S.C. § 1129(b); *Route 37*, 987 F.2d at 157 n. 5.

position to any other plan, the only way Fairfield can obtain confirmation is by using the cramdown method. Consequently, whether or not a plan will be confirmed depends on how the claims in this case are classified. If Hyperion's claim is classified together with those of the other unsecured creditors, Hyperion will block approval of the plan. If classified separately, presumably the trade creditors would vote to approve the plan and the plan could be confirmed. Fairfield's plan is therefore confirmable only if its classification scheme, which separately classifies Hyperion's claim from those of the trade creditors, is proper.

## 3. Classification of Claims

■ Section 1122, which governs classification of claims, simply provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Thus, the Code only prohibits placing dissimilar claims into the same class. Section 1122 does not prohibit, or even address, whether claims that are substantially similar may be placed in separate classes.[6] In *Jersey City Medical Center*, the Third Circuit addressed this issue, holding that the grouping of similar claims into different classes is generally permissible. 817 F.2d at 1061. The Third Circuit, however, has also recognized that "the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes." *Route 37*, 987 F.2d at 158. This is because the confirmation requirements of Section 1129 require approval of at least one impaired class in order to confirm a plan of reorganization. If a debtor had complete discretion with respect to classification of claims, the confirmation requirements would be seriously undermined if a debtor could gerrymander classes. A debtor

could then construct a classification scheme designed to secure approval by an arbitrarily designed class of impaired claims even though the overwhelming sentiment of the impaired creditors was that the proposed reorganization of the debtor would not serve any legitimate purpose. This would lead to abuse of creditors and would foster reorganizations that do not serve any broader public interest.

*Id.; see also Jersey City Medical Center*, 817 F.2d at 1061 ("Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.") (*quoting In re U.S. Truck Co., Inc.*, 800 F.2d 581, 586 (6th Cir.1986)); *Greystone*, 995 F.2d at 1277 ("Classification of claims ... affects the integrity of the voting process, for, if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate 'acceptance' by artful classification.").

■ Accordingly, the Third Circuit has held that the classification of claims must be reasonable. *Route 37*, 987 F.2d at 158; *Jersey Medical Center*, 817 F.2d at 1061. In *Route 37*, the court stated that the determination of whether a classification scheme is reasonable must be informed by the two purposes of classification, that is, voting to determine whether a plan can be confirmed and treatment of claims under the plan. *Route 37*, 987 F.2d at 159. The court continued:

where ... the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that

---

6. As a general matter, similar claims are placed into the same class. "Substantially similar claims" are those which share common priority status and other legal rights against the debtor's assets. *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir.1991), *cert. denied,* ––– U.S. ––––, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). "Accordingly, 'unsecured claims will, generally speaking, comprise one class, whether trade,

tort, publicly held debt, or a deficiency of a secured creditor' because 'they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims.'" *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. Partnership*, 155 B.R. 93, 99 (D.N.J.1993) (*quoting 266 Washington*, 141 B.R. at 282).

is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10) (1988).

*Id.*

*Route 37* involved a debtor partnership whose main asset was an industrial and commercial park. The debtor obtained a loan of $5,700,000, secured by a mortgage on the park. After the debtor defaulted on the loan, the mortgagee, John Hancock Mutual Life Insurance Company ("Hancock"), commenced a foreclosure action in state court. The debtor thereafter filed a bankruptcy petition which stayed the foreclosure proceedings. The disclosure statement listed Hancock's claim as $5.9 million and the liquidation value of the property as $2.2 million. Because the creditor's claim was undersecured, the reorganization plan divided Hancock's claim into a secured portion in the amount of $2.2 million and an unsecured deficiency claim of $3.7 million. The plan further classified all of the unsecured claims, other than Hancock's into one class; these were estimated to total approximately $492,-000. Hancock's unsecured claim of $3.7 million was placed into a separate class. The plan, however, treated all the unsecured claims, including Hancock's, in identical fashion.

The Third Circuit, following the approach of the Fourth, Fifth and Eighth Circuits,[7] held that such a classification scheme was improper, rejecting the debtor's proffered justifications for its classification scheme. *Id.* at 161. The court therefore held that the plan of reorganization had no reasonable prospect of confirmation and that Hancock was therefore entitled to stay relief. *Id.*

**B. Merits**

 Applying *Route 37* to the fact in this case, the bankruptcy court found that the classification scheme was improper and therefore found that the plan could not be confirmed. On appeal, Fairfield argues that the bankruptcy court misconstrued the holding of *Route 37* and misapplied the law to the facts. Fairfield also argues that public policy considerations mandate classifying Hyperion's claim apart from those of the trade creditors. I will address each of these arguments in turn.

**1. Application of *Route 37***

Fairfield first argues that *Route 37* is inapplicable to these facts. Specifically, Fairfield argues that the issue before the Court of Appeals in *Route 37* was whether similar claims could be separately classified. According to Fairfield, *Route 37* is therefore inapplicable to this case because this case involves *dissimilar* claims. In fact, Fairfield argues that because the claims in this case are dissimilar, it was *required* under Section 1122 to classify the claims separately. Fairfield accordingly urges this court to apply the case law applicable to classification of dissimilar claims.

As an initial matter, Fairfield's argument "puts the horse before the cart." The similarity of the claims was not self-evident in *Route 37*, but rather, constituted a legal conclusion reached by the Third Circuit upon examination of the relevant facts. In fact, the debtor in *Route 37* argued, as in this case, that the unsecured deficiency claim was different from the other unsecured claims. I therefore find that the analysis employed by the Third Circuit in *Route 37* is fully applicable here.

Fairfield has proffered several justifications for its classification scheme and I will consider each in turn. Fairfield argues that the Hyperion deficiency claim substantially differs from the claims of the general unsecured trade creditors because of its size and nature.[8] Specifically, it argues that each of

---

7. Those cases are *In re Bryson Properties, XVIII,* 961 F.2d 496 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *Greystone,* 995 F.2d 1274 (5th Cir.1991); and *Lumber Exchange,* 968 F.2d 647 (8th Cir.1992).

8. The only authority Fairfield cites in support of its position is *In re Club Associates,* 107 B.R. 385 (Bankr.N.D.Ga.1989). In *Club,* the bankruptcy court held that the claim of a mortgagee and the claims of unsecured trade creditors were not substantially similar based on their size and

the trade creditors "provided goods and/or services to Fairfield and expected to be paid in full." In contrast, it argues that Hyperion was fully aware that the Fairfield loan was in default when it purchased the loan and that although Hyperion "anticipated earning a return on its investment within a short period of time, it could not reasonably be expected to realize the face amount of the loan." Fairfield Brief at 17. According to Fairfield, this difference in expectation mandates that the claims be separated.

■■ I disagree. I find that the subjective anticipation of payment on the part of a creditor does not provide an appropriate basis for a classification scheme. Fairfield cites no relevant case law supporting its contention that this would be an appropriate basis for classifying claims and I find that such an approach, requiring examination of the subjective intentions of creditors, would be unwieldy as a practical matter. Such an approach would "improperly focus[ ] on the motives and agenda of the claim holder rather than on the nature of the underlying claim." *In re 500 Fifth Avenue Associates*, 148 B.R. 1010, 1019 (Bankr.S.D.N.Y.), *aff'd*, 1993 WL 316183 (S.D.N.Y.1993).[9]

Contrary to Fairfield's argument, the way in which a claim arises is not determinative of its similarity to other claims. *See Route 37*, 987 F.2d at 161 (" 'How the claims of the [insurance company] and the trade creditors achieved their status' ... 'does not alter their current legal character and thus does not warrant separate classification.' ") (*quoting Lumber Exchange*, 968 F.2d at 649). In

addition, classifying Hyperion's claim separately because it bought the Fairfield loan at a discount with knowledge that Fairfield was in default would run counter to the principle that the price paid for a claim does not affect the amount of the creditor's claim, or the creditor's voting power. *See In re Pittsburgh Rys. Co.*, 159 F.2d 630, 632–33 (3d Cir.1946) ("the prices which security holders pay for their securities in no wise affects the measure of their participation in reorganization or their voting power"), *cert. denied*, 331 U.S. 819, 67 S.Ct. 1309, 91 L.Ed. 1837 (1947).

In any event, the integrity of Fairfield's argument based on the differing expectations of the creditors is belied by the very terms of the plan, which treat the claim of Hyperion and the trade creditors in virtually identical fashion. *Cf. Greystone*, 995 F.2d at 1280–1281 (rejecting argument based on "realities of business" where plan failed to treat claims of trade creditors and deficiency claim differently).[10]

■■ Fairfield also argues that the size of Hyperion's claim renders it substantially different from those of the trade creditors, which, in the aggregate, total $63,000. This argument is equally without merit. In *Route 37*, the unsecured deficiency claim substantially outweighed the claims of the other unsecured creditors. 987 F.2d at 156 (deficiency claim was $3.7 million and other claims totalled approximately $492,000); *see also Lumber Exchange*, 968 F.2d at 648 (deficiency claim was approximately $13,800,000 and claims of unsecured trade creditors to-

---

character. *Id.* at 401. *Club*, however, is not binding on this court and its reasoning has been questioned by other courts. *See 266 Washington*, 141 B.R. at 285 n. 18 (rationale underlying *Club* and other cases permitting separate classification of unsecured deficiency claims is "not too clear, but would seem also to revolve about the asserted justifications for separate classification discredited by the Fifth and Fourth Circuits [in *Bryson* and *Greystone*]")

9. The only case cited by Fairfield, *In re 11,111, Inc.*, 117 B.R. 471 (Bankr.D.Minn.1990), is simply not on point. As an initial matter, the two types of unsecured claims in that case were subject to *different treatment* under the plan. One group received 40% of their claims, while the other group received nothing. The issue in the case therefore was whether the plan unfairly

discriminated against those creditors who received nothing under the plan. *Id.* at 478. Moreover, to the extent the decision addresses the issue of classification, its reasoning is at odds with that of *Route 37* and must therefore be rejected. In fact, in *Route 37*, the Third Circuit expressly noted that the approach it was adopting was in conflict with those of several other lower courts, including *11,111 Inc. See Route 37*, 987 F.2d at 161 n. 11.

10. In light of the above, Fairfield's request for discovery relating to how Hyperion acquired the loan and more specifically, whether any of the other loans in the SCCC portfolio were in default at the time Hyperion purchased the portfolio, is moot. The bankruptcy court therefore properly denied discovery on this issue.

talled approximately $453,000); *Greystone,* 995 F.2d at 1276–77 (deficiency claim was approximately $3,500,000 and claims of unsecured trade creditors totalled approximately $10,000).

In fact, the Eighth Circuit expressly rejected this argument in *Lumber Exchange.*[11] The debtor in that case argued that because the exposure of the holder of the unsecured deficiency claim was so much greater than that of the other unsecured creditors, the debtor must treat the creditors differently in order to satisfy the fairness conditions to cramdown. The court rejected this argument, stating "[the debtor], in effect, suggests that 'fairness' demands separate classification to facilitate the cramdown of a plan, at least in part to pay trade creditors approximately $6,600, a suggestion we find untenable." 968 F.2d at 649. In fact, according to the *Lumber Exchange* court, the small size of the trade creditors' claims weighed in favor of classifying the claims together. *Id.* at 650 (because amount of trade creditor debt is "minimal" compared to deficiency claim, there was "no practical reason" why debtor "could not classify the claims together and offer them similar treatment.")

 Fairfield next argues that its fiduciary obligations as a debtor-in-possession to ensure that each creditor is fairly treated mandate that Hyperion's deficiency claim be classified separately. Fairfield argues that based on Hyperion's representation that it will vote against any plan that does not provide for full payment of its claim, the interests of the general unsecured trade creditors and those of Fairfield will be extinguished unless the decision of the bankruptcy court is reversed.

This argument, however, flies in the face of *Route 37.* In that case, the court held

> [a]bsent bad faith or illegality (*see* 11 U.S.C. § 1126(e) (1988)), the Code is not concerned with a claim holder's reason for voting one way or the other, and undoubtedly most claim holders vote in accordance

with their overall economic interests as they see them.

987 F.2d at 161.

Fairfield argues that Hyperion's express representation that it would not vote for any plan constitutes bad faith. However, the fact that Hyperion intended to vote against any plan that did not provide for full payment of its claim or surrender of the Property simply does not constitute bad faith. Indeed, this is implicit in *Route 37's* observation that a creditor typically votes according to its economic interests. *Id.; see also In re Federal Support Co.,* 859 F.2d 17, 19 (4th Cir.1988) ("Each creditor is expected to cast his vote in accordance with his perception of his own self-interest."); *In re Marin Town Center,* 142 B.R. 374 (N.D.Cal.1992). In *Marin Town,* the court held that a creditor who purchased a claim at a discount from the RTC, post-petition, and voted against confirmation of a plan in order to foreclose on the property was not acting in bad faith within the meaning of 11 U.S.C. § 1126(e). The court stated:

> A vote cannot be said to have been cast in bad faith simply because it was voted for the purpose of blocking confirmation of a reorganization plan. In fact, rejection of a plan by "a party, largely interested in the Debtor before his acquisition of controlling rights, who withholds consent to a plan primarily because he believes its consummation will be more injurious to his investment in the Debtor than liquidation, meets the standard of good faith." Section 1126(e) does not require a creditor to have an interest in seeing the debtor reorganize.

142 B.R. at 379 (citations omitted). In contrast with *Marin Town,* Hyperion purchased the note some 11 months before Fairfield filed its bankruptcy petition. *See also 500 Fifth Avenue,* 148 B.R. at 1020 (noting, in dicta, that there is nothing wrong with "a creditor who acquired his claim postpetition at a discount from face value [being] motivated to vote against a plan solely because the spread on what the claim cost him and what

---

11. Fairfield argues that the standards enunciated in *Route 37, Greystone, Bryson* and *Lumber Exchange* are not interchangeable. However, this court is hardpressed to find a meaningful distinc-

tion among these cases relevant to this case. Rather, the Third Circuit cited each of other cases with approval in *Route 37* and essentially treated them as enunciating the same principle.

distribution he is receiving on it is perceived to be too small").[12]

In essence, Fairfield argues that because Hyperion has acknowledged that it would not vote for the Plan, its claim must be separately classified in order to ensure that at least one impaired class—the general unsecured trade creditors—will vote to approve the Plan. Stated differently, Fairfield seeks to use the classification system in order to manipulate the vote and disenfranchise its largest creditor. Fairfield is clearly prohibited from doing so. As the Fifth Circuit put it, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Greystone*, 995 F.2d at 1279. Accordingly, neither Fairfield's "fiduciary duty" nor the fact that Hyperion acknowledges that it will not vote for any plan provides a justification for classifying Hyperion's claim separately.

Fairfield next argues that even if *Route 37* applies to these facts, the bankruptcy court misconstrued the holding of *Route 37* and therefore misapplied the law to the facts of this case. Specifically, Fairfield argues that under *Route 37*, even if the sole purpose of the classification is to gerrymander the vote, the classification must be upheld if each class represents a voting interest that is sufficiently "distinct and weighty" to merit a vote. "In other words, if, as in this case, the separate classification of unsecured creditors is because they are not substantially similar as required by 11 U.S.C. § 1122(a), the separate classification must be sustained." Fairfield Brief at 21. This argument, however, merely restates Fairfield's first argument that Hyperion's deficiency claim and the claims of the trade creditors in this case are dissimilar and therefore warrant separate classification.

In sum, it appears that the sole purpose of classifying Hyperion's deficiency claim separately was to disenfranchise Hyperion and ensure that there would be at least one class that would vote to approve the Plan. This intent to gerrymander is evidenced from the face of the proposed Plan. The "only apparent reason, other than to manipulate class voting, for placing similar claims in different classes, is to treat them differently." *In re Lumber Exchange Building Limited Partnership*, 125 B.R. 1000, 1006 (Bankr.D.Minn. 1991), *aff'd*, 968 F.2d 647 (8th Cir.1992). Here, the Plan treats Hyperion's claim and the claims of the unsecured trade creditors in virtually identical fashion. The Plan proposed to pay each of these claims 22% of the allowed claims, 2% on the effective date of the Plan and 5% on the first through the fourth anniversaries of the effective date.[13] As the Fourth Circuit explained in *Bryson*, 961 F.2d at 502, "[w]here all unsecured claims received the same treatment in terms of the Plan distribution, separate classification ... is, at a minimum highly suspect." [14]

## 2. Public Policy Considerations

Fairfield argues that public policy considerations and the equities of this case mandate classifying Hyperion's unsecured deficiency claim apart from the claims of the general unsecured trade creditors. Specifically, Fairfield argues that the circumstances surrounding Hyperion's acquisition of the debtor's loan, the magnitude of the windfall to Hyperion and the fact that the debtor's interests as well as those of the unsecured general trade creditors will be extinguished if Hyperion is allowed to proceed with foreclosure require reimposition of the stay.[15]

---

**12.** Fairfield argues somewhat disingenuously that "[t]here is a distinction between voting not to accept a plan for economic reasons and asserting that no plan will be acceptable. The latter smacks of bad faith." Fairfield Brief at 22. Obviously the reason Hyperion would not vote for any plan that did not provide for full payment of its claim is economic.

**13.** Fairfield's argument that Hyperion is treated differently under the plan because Hyperion will make a profit on its investment under the plan, whereas the unsecured creditor will suffer substantial losses, borders on being frivolous. The

relevant inquiry is what the rate of payout on the claims will be under the plan.

**14.** Indeed, to the extent there are differences between the claims, they appear to be entirely irrelevant, since they result in differential treatment of the two classes.

**15.** Fairfield argues that the bankruptcy court ignored the "equities" of the case, observing that the court "was apparently unconcerned that the interests of all general unsecured creditors, as well as Fairfield's would be extinguished." Fairfield Brief at 25. I wholeheartedly disagree.

I disagree. Fairfield is essentially reiterating the same arguments addressed above under the label of "public policy." As noted above, the manner in which Hyperion acquired the claim and the amount it paid for the loan are not relevant to the legal status of the claim. Although Fairfield argues that Hyperion would be receiving a windfall, that is simply not the case. Fairfield concedes that it received $13,000,000 of loan proceeds. Therefore, reducing Hyperion's claim to the amount paid "would result in unearned, undeserved profit *for the debtor.*" *Pittsburgh,* 159 F.2d at 632 (emphasis added); *see also In re Mt. Rushmore Hotel Corp.,* 146 B.R. 33, 36 (Bankr.D.Kan.1992) (reducing bond buyers' claims to the amount they paid for the bonds "would simply provide an undeserved windfall to the debtor and its [other] creditors.").

■ Nor does the fact that Fairfield will be unable to achieve a cramdown in this case mandate reversal of the bankruptcy court's ruling. As noted above, "fairness" to all creditors alone does not justify gerrymandering. *See Lumber Exchange,* 968 F.2d at 649–50; *see also Greystone,* 995 F.2d at 1280 (policy considerations cannot be used to justify gerrymandering of vote); *500 Fifth Avenue,* 148 B.R. at 1010 (same). In *Greystone,* the bankruptcy court denied stay relief, believing that Congress did not foresee the potential impact of a creditor's deficiency claim on the debtor's ability to achieve a cramdown plan. 995 F.2d at 1280. The Fifth Circuit rejected this approach, stating that:

> it results here in violating § 1122, by gerrymandering the plan vote, for the sake of allegedly effectuating a § 1129(b) cramdown. "Policy" considerations do not justify preferring one section of the Code, much less elevating its implicit "policies" over other sections, where the statutory language draws no such distinctions.

*Id.; see also In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir.1989) (although a bankruptcy court is a court of equity, it may employ its equitable powers "only insofar as those powers are applied in a manner consistent with the Code").

Indeed, as one court recognized,

> Cramdown is a powerful remedy available to plan proponents under which dissenting classes are compelled to rely on difficult judicial valuations, judgments, and determinations. The policy underlying Section 1129(a)(10) is that before embarking upon the tortuous path of cramdown and compelling the target of cramdown to shoulder the risks of error necessarily associated with a forced confirmation, there must be some other properly classified group that is also hurt and nonetheless favors the plan.

*266 Washington,* 141 B.R. at 287.

Fairfield also raises the specter that "[i]f the decision of the trial court is left in place, the only result is that the small unsecured creditors will be forced into bankruptcy as more and more single asset debtors are denied the protections of the Bankruptcy Code by sharp speculators." Fairfield Brief at 27. In fact, Fairfield argues that the decision of the bankruptcy court "isolates single asset debtors for differential and prejudicial treatment. The inevitable result of the decision will be the demise of, rather than the rehabilitation of such debtors." Fairfield Brief at 1–2.

Again, I must disagree. Although in this case, application of the principles enunciated by the Third Circuit and other courts prohibiting gerrymandering lead to an unfavorable result vis-a-vis Fairfield, that is a far cry from claiming that the court is essentially denying all single asset debtors the protections of the bankruptcy law. "If [Hyperion's] unsecured claim were lower and the trade debt were higher, or if there were other impaired classes that favored the plan, a cramdown plan would be more realistic. That [Fairfield's] cramdown plan may not succeed on the facts before [this court] does not disprove the utility of the cramdown provisions." *Greystone,* 995 F.2d at 1280.

Judge Winfield in fact expressed regret at what she felt was the only proper resolution of Hyperion's motion in light of *Route 37. See* Tr. at 72, 75.

## Conclusion

For the foregoing reasons, I conclude that Fairfield's classification scheme in its proposed plan of reorganization is improper. Accordingly, the plan is not confirmable and Hyperion is entitled to stay relief. Therefore, the decision of the bankruptcy court is affirmed.