In re TUCSON SELF–STORAGE, INC.,
an Arizona corporation, Debtor.

OXFORD LIFE INSURANCE
COMPANY, Appellant,

v.

TUCSON SELF–STORAGE,
INC., Appellee.

BAP No. AZ–93–1114–RVMe.
Bankruptcy No. 91–2130–TUC–LO.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted on Sept. 23, 1993.

Decided March 31, 1994.

Amended Opinion May 10, 1994.

violated the absolute priority rule. We RE-VERSE and REMAND.

## I. FACTS

On May 22, 1991, the Debtor/Appellee, Tucson Self–Storage, Inc. ("Tucson"), was formed and incorporated under the laws of the State of Arizona. Tucson owns and operates its only asset, a mini-storage facility in Tucson, Arizona ("Storage Facility").

On that date, Tucson acquired the Storage Facility from Villa Catalina Building Corporation. As part of the transfer, Tucson assumed all outstanding debts. The Storage Facility was subject to a first deed of trust in favor of Merabank, a Federal Savings Bank ("Merabank").[3] The Storage Facility was also subject to a second deed of trust in favor of Point Loma Foundation ("PLF").[4]

On June 17, 1991, Tucson filed a Chapter 11 petition. On March 9, 1992, Tucson filed a disclosure statement and a proposed plan of reorganization. The disclosure statement provided for a reduction of the secured claims to the fair market value of the Storage Facility. Both Merabank/RTC and PLF were holders of deficiency claims which were also separately classified.

Tucson was indebted to Merabank/RTC for $1,642,917.35 plus accrued interest, charges, costs and attorneys' fees. Tucson was also indebted to PLF for $400,000. The court valued the Storage Facility at $1.5 million. The class 6 deficiency claim of Merabank/RTC was listed at $355,000. The class 7 deficiency claim of PLF was listed at $400,000.

Initially, Merabank/RTC was to receive only ten percent of its deficiency claim, while PLF was to receive twenty-five percent of its deficiency claim. The plan eventually was amended to provide a 10% payoff respectfully to Merabank/RTC's deficiency claim and to

John R. Clemency, Phoenix, AZ, for appellant.

Clifford B. Altfeld, Tucson, AZ, for appellee.

Before: RUSSELL, VOLINN and MEYERS, Bankruptcy Judges.

### AMENDED OPINION [1]

BARRY RUSSELL, Bankruptcy Judge:

A creditor appeals from the bankruptcy court's order confirming a Chapter 11 [2] plan of reorganization, arguing that the plan improperly placed similar claims in separate classes, the plan unfairly discriminated and

---

**1.** The prior Opinion filed on March 31, 1994 is amended to adopt the standard of review discussed in *In re Johnston*, 21 F.3d 323, 326–27 (9th Cir.1994).

**2.** Unless otherwise indicated, all chapter, section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

**3.** Merabank was the original construction lender, which was subsequently placed into receivership by the Resolution Trust Corporation ("RTC"). All subsequent references to Merabank will be "Merabank/RTC."

**4.** PLF is a religious college foundation which loaned money to Peter and Recie Herder, who subsequently sold the Storage Facility to Villa Catalina Building Corporation.

PLF, while the unsecured trade creditors were to be paid in full.

■ On July 21, 1992, Merabank/RTC filed an objection to the plan. Merabank/RTC objected to: (1) the improper classification of claims; (2) the discriminatory treatment of claims; (3) the violation of the absolute priority rule; (4) the application of a below-market interest rate and terms; (5) the improper calculation of secured claims; (6) feasibility; and (7) the plan not being proposed in good faith. In addition, Merabank/RTC objected to the classification of unsecured trade creditors as an administrative convenience class and to the disparate treatment, allowing the trade creditors[5] to receive 100% distribution under the plan, while the deficiency claims receive 10% distribution.

Despite the objection of Merabank/RTC, Tucson reported that all voting creditors voted in favor of the plan except Merabank/RTC. On July 28, 1992, the court held the first of nine confirmation hearings.

Merabank/RTC sold its note secured by the first deed of trust to Oxford Life Insurance Company ("OLIC"). On October 23, 1992, a notice of substitution of real party in interest was filed. The court continued the confirmation hearing.

On December 23, 1992, Tucson filed a first amended plan. The amended plan provided for identical treatment of PLF and OLIC's deficiency claims. On January 6, 1993, OLIC filed an objection to plan confirmation which essentially raised Merabank/RTC's previous objections.

On January 14, 1993, the court ordered the plan confirmed, with January 29, 1993 as the effective date of the plan. On January 25, 1993, OLIC filed a notice of appeal of the confirmation order.

On January 29, 1993, Tucson borrowed $92,000 from Daniel and Olga Kujawa and the Felkner Children's "S" Trust.[6] On that date, Tucson disbursed checks to OLIC ($30,026)[7] as payment of the Class 6 deficiency claim and PLF ($75,531) as payment of the Class 7 deficiency claim.[8] All priority and administrative claims were paid in full on the effective date of the plan.

On that date, OLIC filed a motion for stay pending appeal to stay the execution of the plan with the bankruptcy court. On February 4, 1993, that motion was denied.

---

5. It appears from the record that the Class 5 unsecured trade creditors were only owed $2,124.27 and that under the plan they may be impaired as they were to be paid in full 60 days after the effective date of the plan. Oxford Life Insurance Company asserts that since the Class 5 unsecured trade creditors are to be paid in full, they are not an impaired class. Congress has defined impairment in the broadest possible terms. Under this broad definition, "any alteration of the rights constitutes impairment even if the value of the rights is enhanced." *In re L & J Anaheim Associates*, 995 F.2d 940, 942 (9th Cir. 1993) (quoting *In re Acequia, Inc.*, 787 F.2d 1352, 1363 (9th Cir.1986)). Since the Class 5 unsecured trade creditors must wait 60 days after the effective date to be paid in full, we believe that they are a permissible impaired class for "cram down" purposes under § 1129(b)(1).

Because Class 5 is not a proper separate class (as discussed below), it is unnecessary for us to determine if the impairment of Class 5 resulted in the plan not being proposed in good faith.

6. Tucson's dealings with PLF are somewhat inbred. OLIC contends that Tucson was formed for the sole purpose of benefitting a junior lienholder, PLF, and not for any legitimate business purpose. OLIC has offered testimony that this case was filed for the benefit of PLF and claims

Tucson has not disputed this fact. Additional facts of this particular relationship are: (1) the debtor's attorney, Sidney Lex Felkner ("Felkner") negotiated with Merabank/RTC on behalf of PLF, in attempting to lessen the economic impact of a failed project; (2) after negotiations failed, Felkner set up Tucson Self Storage, Inc. to "lessen the damage to PLF"; (3) Felkner's daughter is one of Tucson's directors; and (4) the Felkner Children's "S" trust provided a new loan to Tucson which was secured and to be paid by Tucson. It is unclear from the record the relationship of Daniel and Olga Kujawa to Tucson. The only fact known is that Daniel Kujawa and Felkner's daughter are directors of Tucson.

7. OLIC has not cashed the check sent by the Debtor.

8. Merabank/RTC's Class 6 deficiency claim was for $355,000. PLF's Class 7 deficiency claim was for $400,000. Tucson has tendered to PLF approximately a 19% distribution while only paying an 8.5% distribution to Merabank/RTC. Surprisingly, the plan as amended proposed to pay both Merabank/RTC and PLF an identical 10% distribution. This appears to be a highly questionable payment to PLF, but it is not the subject of this appeal.

On February 12, 1993, OLIC filed an emergency motion for a stay pending appeal with the BAP. On February 19, 1993, the BAP granted a stay pending appeal.

## II. ISSUES

A. Whether the appeal of the order of confirmation is moot since the debtor has commenced the issuance of payments pursuant to the plan.

B. Whether the segregation of unsecured claims into separate classes from other unsecured claims in order to obtain an accepting impaired class constitutes an improper classification.

C. Whether the disparate treatment of the unsecured deficiency claims constitutes unfair discrimination under the plan.

D. Whether the advance of money to the debtor by equity holders constituted "new value" in accordance with the new value exception to the absolute priority rule.

## III. STANDARD OF REVIEW

■ A bankruptcy court's finding that a claim is or is not substantially similar to other claims, constitutes a finding of fact reviewable under the clearly erroneous standard. *In re Johnston,* 21 F.3d at 327 (9th Cir.1994) (quoting *In re Commercial Western Fin. Corp.,* 761 F.2d 1329, 1334 (9th Cir.1985)). The bankruptcy court's conclusions of law are reviewed *de novo. In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1377 (9th Cir.1985).

## IV. DISCUSSION OF ISSUES [9]

A. *Mootness*

■ Tucson contends that this appeal should be dismissed as moot because it has substantially consummated the plan by commencing payments pursuant to the plan. Although a stay pending appeal was obtained after the effective date of the plan, this appeal is nonetheless not moot.

■ When an appellate court is unable to grant effective relief, the appeal must be dismissed as moot. *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895); *In re Carroll,* 903 F.2d 1266, 1269–70 (9th Cir.1990); *In re Combined Metals Reduction Co.,* 557 F.2d 179, 187 (9th Cir.1977); *In re Blumer,* 66 B.R. 109, 113 (9th Cir. BAP 1986), *aff'd,* 826 F.2d 1069 (9th Cir.1987). The question, then, is whether effective relief would be precluded in the event of reversal by the Panel.

Tucson borrowed $92,000 from insiders. Although Tucson alleges that its shareholders are obligated under the loan, it is Tucson that is repaying the loan through its cash flow beginning in the ninth month of the plan. Tucson's shareholders are bearing no cost, risk, or burden, while pledging Tucson's assets to receive the principal and interest payments for the next fifteen years.[10]

The money disbursed by Tucson represents only a small portion of the total amount to be paid under the plan. This Panel is still able to structure effective relief by remanding with instructions to order the return of any erroneously disbursed funds. We have issued such instructions in the past: " '[T]his Panel could structure effective relief by remanding with instructions to the trial court to order the return of any erroneously disbursed funds.' " *In re Blumer,* 66 B.R. at 113 (quoting *In re Intern. Environmental Dynamics, Inc.,* 718 F.2d 322, 326 (9th Cir. 1983)). Additionally, future payments may be adjusted prospectively in order to arrive at the settled amount. As a result, we are of the opinion that the appeal of the confirmation order is not moot and that we may consider the merits.

B. *Improper Classification*

■ Section 1122(a) provides that for claims other than those classified together for administrative convenience, "a plan may

---

9. OLIC raised other issues in their brief which are not fully addressed in this opinion. Essentially, these issues are that the bankruptcy court erred in confirming the plan because: it was not proposed in good faith, that the plan is not feasible, and that the plan was not fair and equitable based upon interest rates and valuation of claims.

10. OLIC asserts, based on Tucson's projections, that the principal amount of the loan will be repaid after the first three years, while the shareholders will receive at least $36,000 per year for the remaining 12 years under the plan for a total of $432,000.

place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Courts are not in complete agreement on whether § 1122(a) permits separate classification of substantially similar claims, mandating only that those claims that are classified be substantially similar, or whether § 1122(a) requires the classification of substantially similar claims in the same class. *See Greystone,* 995 F.2d 1274. Even if § 1122(a) is read to permit separate classification, it is not without limitation:

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. "[T]here must be some limit on a debtor's power to classify creditors ... [sic] The potential for abuse would be significant otherwise." If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.

*In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990) (citations omitted).

The Fifth Circuit in *In re Greystone III Joint Venture,* viewed prior case law as establishing what the court termed the "one clear rule" that a debtor cannot "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Greystone,* 995 F.2d at 1279.

> We conclude that if § 1122(a) permits classification of "substantially similar" claims in different classes, such classification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.

*Id.*

The Sixth Circuit warned of the potential abuse of a wholly permissive reading:

> Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In re U.S. Truck Co.,* 800 F.2d 581, 586 (6th Cir.1986); *see also In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990); *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1313 (8th Cir.1987). "Separate classifications for unsecured creditors are only justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors.'" *Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund,* 748 F.2d 42, 46 (1st Cir.1984) (citation omitted).

■ Tucson asserts that OLIC and PLF are separated because of the nature of their claims, since OLIC has a right to be fully secured under a § 1111(b)(2) election. This argument is inconsistent with the Code's elimination of any legal distinction between non-recourse deficiency claims and other unsecured claims. *In re Washington Associates,* 147 B.R. 827, 831 (E.D.N.Y.1992); *In re Greystone III Joint Venture,* 995 F.2d at 1279 (holding that Bankruptcy Code has eliminated legal distinction between non-recourse deficiency claims and other unsecured claims); *In re Fairfield Executive Assoc.,* 161 B.R. 595, 600 n. 6 (D.N.J.1993) ("[U]nsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor, because they are claimants of equal legal rank entitled to share pro rata.") (quoting *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. Partnership,* 155 B.R. 93, 99 (D.N.J.1993)); *In re Cantonwood Assoc. Ltd. Partnership,* 138 B.R. 648, 657 (Bankr. D.Mass.1992) (holding that debtor's separate classification of deficiency and trade creditors was improper). Moreover, the election is to be exercised by the creditor, not the debtor. *In re Coventry Commons Assoc.,* 155 B.R. 446, 450 (E.D.Mich.1993). We see no basis in the Code, other than the provision for "administrative convenience" claims in § 1122(b), for an assertion that the right to make a § 1111(b)(2) election, without any other reason, justifies different treatment of claims. We hold that the separate classification of unsecured claims solely on their right to make a § 1111(b)(2) election is an impermissible classification in violation of § 1122(a).

In the case before us, Tucson and PLF have offered no business or economic justification for the separate classification of the unsecured claims, which includes not only the separate classification of trade creditors from the deficiency claims but the separate classification of the respective deficiency claims of PLF and OLIC. The claims are otherwise similarly situated to the general unsecured claims in every other respect. There is no legal distinction between the claims that would justify separate classification. Therefore, Tucson separately classified the PLF claim for the sole purpose of gerrymandering an accepting impaired class in violation of § 1129(a)(10).

The separate classification of four unsecured trade creditors cannot be justified as an "administrative convenience." [11] Generally, an administrative convenience class is one where the claims are so small in amount and large in number as to make dealing with them burdensome. The unsecured debt owing to trade creditors was approximately $2,124.27, which was to be paid in full under the plan. The PLF unsecured deficiency claim was approximately $400,000, while the OLIC unsecured deficiency claim was approximately $355,000. No evidence was presented at the confirmation hearing showing that any of the trade creditors should be classified as an administrative convenience under § 1122(b). The plan, as amended, treats the deficiency claims in the exact same manner (10% distribution). Thus, the separate classification of the PLF claim is an impermissible classification made for the sole purpose of gerrymandering an affirmative vote of an impaired class.

## C. Unfair Discrimination

Similar to the issue of impermissible classification is the issue of unfair discrimination. OLIC argues that a plan providing that an unsecured trade creditor who receives 100%, while a deficiency creditor receives only 10%, unfairly discriminates. In order to be confirmed under § 1129(b), the Code requires that a plan "not discriminate unfairly." 11 U.S.C. § 1129(b)(1). A plan discriminates unfairly if it singles out the holder of some claim or interest for particu-

lar treatment. *See In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151–52 (Bankr. S.D.N.Y.1984).

Courts have denied confirmation of Chapter 11 plans that proposed widely disparate treatment of similarly situated creditors as unfairly discriminatory. *See In re Caldwell*, 76 B.R. 643, 646 (Bankr.E.D.Tenn.1987) (denying confirmation of Chapter 11 plan where plan proposed to pay class of unsecured credit card claims 100%, but proposed to pay class of all other unsecured claims only 22.-7%); *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd*, 843 F.2d 636 (2d Cir.1988) ("[A] plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes."); *In re Jartran, Inc.*, 44 B.R. 331 (Bankr.N.D.Ill.1984); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 831 (Bankr.S.D.N.Y.1982) (holding that plan cannot place a secured creditor's deficiency claim in separate class receiving different treatment from other unsecured claims).

Here, there is disparate treatment of classes that have identical legal rights. Tucson's plan provides for 100% payment of the allowed trade creditors, without interest, on or within sixty days of the effective date of the plan. The claims of OLIC and PLF, however, would be paid only 10% in full satisfaction of their debt. In Tucson's brief, it argues that "small trade creditors who provided actual goods and services are paid in full pursuant to the public policy recognized in the Bankruptcy Courts for the District of Arizona." However, no evidence was presented supporting the unsecured trade creditor "public policy" rule.

We therefore hold that the Chapter 11 plan cannot be confirmed where the plan proposes to pay unsecured deficiency claims only 10%, but proposes to pay other unsecured claims in full, with the only justification offered for the disparate treatment is the recognized "public policy" to pay for actual goods and services in full. Such a plan "discriminates unfairly" in violation of § 1129(b)(1) and cannot be confirmed.

---

11. *See* discussion of this class in footnote 4.

### D. *Absolute Priority Rule*

 OLIC argues that the plan violates the absolute priority rule. The absolute priority rule is incorporated into the Bankruptcy Code in § 1129(b)(2)(B)(ii). The absolute priority rule requires that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganized plan. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988); *In re Johnston,* 140 B.R. 526, 529 (9th Cir. BAP 1992); *In re Green,* 98 B.R. 981, 982 (9th Cir. BAP 1989).

 The Ninth Circuit now recognizes the new value exception to the absolute priority rule. *In re Bonner Mall Partnership,* 2 F.3d 899, 907–08 (9th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994). The new value exception allows the equity owners of a debtor in bankruptcy to obtain an interest in the reorganized debtor in exchange for new capital contributions over the objections of a class of creditors that have not received full payment on its claims. *Id.* at 915.

 Under pre-Code Bankruptcy Act practice, equity owners (e.g. stockholders of a corporation) in a business that had filed for bankruptcy protection were required to meet several requirements in order to take advantage of the doctrine. Former equity owners were required to offer value that was: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received. *Case v. Los Angeles Lumber Products Co., Ltd.,* 308 U.S. 106, 121–22, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939), *reh'g denied,* 308 U.S. 637, 60 S.Ct. 258, 84 L.Ed. 529 (1939); *In re Bonner Mall Partnership,* 2 F.3d at 908.

 In evaluating whether a plan satisfies the requirements of the new value exception, a court is in fact determining whether old equity holders are unjustifiably attempting to retain their ownership powers in viola-

tion of the absolute priority rule or whether there is a genuine and fair exchange of new capital for an equity interest. The Ninth Circuit has stated that if a proposed plan satisfies all of the *Case v. Los Angeles Lumber* requirements, it will not violate the absolute priority rule. *Bonner Mall,* 2 F.3d 899.

 The burden is clearly on the proponent of the plan to satisfy all the requirements of the new value exception. Tucson has not met its burden. Tucson asserts that by providing "actual money," its plan has met the new value exception.

Tucson's plan provides that the:

> Debtor's equity security holders or new investors will contribute a total of $50,000 [12] to the Reorganized Debtor on the Effective Date. Any equity security holders who do not contribute new money to the Debtor will have their claims extinguished and will thereafter hold no interest in the Debtor. Any equity security holders who contribute new money will retain their interest in the Reorganized Debtor, proportionate to the amount of new funds contributed by all new investors. Prior contributions will not be counted in the Reorganized Debtor.

The alleged new value is in reality a loan to Tucson pledged by its assets. There was no present contribution of new value. Instead, Tucson was merely adding another liability to its balance sheet that must be repaid from the accumulated earnings of the reorganized debtor.[13] In fact, Tucson's shareholders are bearing no cost, risk, or burden, while pledging Tucson's assets to receive principal and interest payments for the next 15 years.

 In addition, there was no showing of any necessity for this so called "new value." Merely using the funds to pay priorities and administrative claimants is not a sufficient reason.

---

**12.** No explanation has been offered as to why $92,000 was apparently contributed.

**13.** In essence, the new investors will receive repayment of their loan at $3,000 per month before they will begin to receive any return on their

investment. OLIC asserts that based on Tucson's projections, the principal amount of the loan will be repaid after the first three years, while the new investors will continue to be paid for the next twelve years under the plan.

Thus, Tucson has not satisfied the new value exception to the absolute priority rule. Since equity interests in Tucson are being retained while unsecured creditors are not being paid in full, the plan is in violation of the absolute priority rule. *See* § 1129(b)(2)(B)(ii).

## V. CONCLUSION

We conclude that this appeal is not moot and that the bankruptcy court erred in confirming Tucson's plan of reorganization for the following reasons: the plan improperly classifies unsecured claims in violation of § 1122(a); the plan discriminates unfairly in its disparate treatment of the unsecured claims in violation of § 1129(b)(1); and that equity interests in Tucson are being retained while unsecured creditors are not paid in full in violation of § 1129(b)(2)(B)(ii).

We REVERSE the order confirming the plan and REMAND this matter to the bankruptcy court for proceedings consistent herewith.

MEYERS, Bankruptcy Judge, concurring:

I concur with the decision announced by Judge Russell. We must reverse the confirmation order because the plan discriminates unfairly in its disparate treatment of the unsecured claims in violation of § 1129(b)(1), and the debtor has not satisfied the new value exception to the absolute priority rule under § 1129(b)(2)(B)(ii).

However, I write separately so as to disavow the discussion in the majority opinion dealing with "improper classification." I do not believe it is necessary for us to add our voice to the continuing debate over the proper approach on the classification of similar claims. There are two primary schools of thought on classification. *See In re Washington Associates,* 147 B.R. 827, 830–31 (E.D.N.Y.1992); *In re Boston Harbor Marina Co.,* 157 B.R. 726, 739 (Bkrtcy.D.Mass. 1993). One school generally adheres to the view that § 1122(a) requires that similarly situated claims must be classified in accordance with the legal priority of the claims. *See Granada Wines v. New England Teamsters and Trucking,* 748 F.2d 42, 46 (1st Cir.1984). The other school notes that, when read literally, § 1122(a) requires only that if a claim is placed in a given class, all other claims in that class must be substantially similar, so that it does not, by its terms, require that similarly situated claims be classified together. Meltzer, *Disenfranchising The Dissenting Creditor Through Artificial Classification or Artificial Impairment,* 66 Am.Bankr.L.J. 281, 290 (1992).

As the Panel noted in *In re Johnston,* 140 B.R. 526 (9th Cir. BAP 1992), § 1122:

> "expressly provides that only substantially similar claims may be placed in the same class . . ., it does not expressly prohibit similar claims from being placed in separate classes. Many courts, while recognizing that Section 1122 does not explicitly forbid a debtor from placing similar claims in separate classes, have imposed limits on the debtor's power to do so."

140 B.R. at 529. Given the plain language of § 1122 I believe that the limits to be imposed regarding classification of similar claims should be based on the dictates of other statutory provisions and should be the exception to the rule, not the rule itself. An example of an appropriate limitation would be one that restricts a plan proponent's power to classify claims to the extent that classifications are designed to manipulate class voting ("gerrymandering"). *See In re Greystone III Joint Venture,* 995 F.2d 1274, 1279 (5th Cir.1991); *In re U.S. Truck Co. Inc.,* 800 F.2d 581, 586 (6th Cir.1986).

My disagreement with the majority is that by seeming to adopt the *Granada Wines* approach, the Panel is making separate classification suspect on its face, when the plain language of the statute would not so suggest.