**In re MT. RUSHMORE HOTEL CORP., Debtor.**

**MT. RUSHMORE HOTEL CORP., Plaintiff,**

**v.**

**COMMERCE BANK, et al., Defendants.**

**Bankruptcy No. 91–41410–11.
Adv. No. 91–7414.**

United States Bankruptcy Court, D. Kansas.

July 10, 1992.

On Motion to Alter or Amend or for New Trial Aug. 12, 1992.

As Corrected Aug. 19, 1992.

John M. Duggan, Daniel D. Phillips, Cynthia F. Grimes, Lewis, Rice & Fingersh, Kansas City, Mo., for debtor-plaintiff.

Jan Hamilton, Leon B. Graves, Alan L. Tipton Hamilton, Peterson, Tipton & Keeshan, Topeka, Kan., for defendants.

John Foulston, Wichita, Kan., U.S. Trustee.

## 34

### MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

This proceeding is before the Court following trial. The debtor-plaintiff appears by counsel Daniel D. Phillips, Cynthia F. Grimes, and John M. Duggan of Lewis, Rice & Fingersh. The defendants appear by counsel Jan Hamilton, Leon B. Graves, and Alan L. Tipton of Hamilton, Peterson, Tipton & Keeshan. The Court has heard the evidence and reviewed the relevant pleadings, and is now ready to rule.

### FACTS

In May of 1987, the debtor received the proceeds of economic development revenue bonds issued by the City of Spearfish, South Dakota, and used them to buy a Holiday Inn Hotel there. Commerce Bank is the trustee of the bonds. Colonial Investment Management Company had purchased the bonds for their full face amount. In February of 1990, Alma Elias, J. Ronald Scott, and Mark Bloom (the bondholders) bought the bonds from Colonial for about $1.4 million. The face amount of the bonds is $7 million. The debtor filed for bankruptcy in 1991.

The debtor filed this proceeding seeking to have the Court (1) determine that the $5.6 million difference between the face amount and the price the bondholders paid should be treated as interest, not allowable as a claim in the bankruptcy case to the extent it is unmatured, as provided by 11 U.S.C.A. § 502(b)(2), and (2) declare that the lien securing the bonds is void to the extent of the disallowed interest. After the trial, the debtor sought leave to amend its complaint to allege the transfer of the bonds from Colonial to the bondholders was champertous and void under South Dakota law. The Court denied leave to amend, but indicated it would consider the champerty argument as an objection to the claim based on the bonds. The parties have filed a number of briefs addressing these issues. The Court will resolve both the issues properly raised in this adversary proceeding and the champerty objection to the bondholders' claim in the course of this decision.

### CONCLUSIONS OF LAW

#### A. MARKET DISCOUNT AS INTEREST UNDER § 502(b)(2)

■ Section 502(b) provides in pertinent part that, upon objection, the Court shall determine the amount of and allow a claim except to the extent that "(2) such claim is for unmatured interest." The debtor makes in essence three arguments for treating the discount on the bondholders' purchase of the bonds as interest which was largely unmatured by the time the debtor filed for bankruptcy. First, it relies on the Internal Revenue Service's treatment of the discount for purposes of taxing the bondholders. Second, it relies on three bankruptcy court decisions that have concluded certain discounts must be disallowed under § 502(b)(2). Finally, it asserts allowing the bond claim in full would be inequitable to the other creditors of the bankruptcy estate.

■ The tax treatment of the bondholders' discount is clearly irrelevant here because the bankruptcy estate is concerned only with claims against the debtor or the bankruptcy estate. *See § 101(5) (defining "claim") and (10) (defining "creditor").* Consequently, whatever else it might mean, "interest" in § 502(b)(2) must mean interest from the debtor's point of view. The bondholders' purchase had no effect on the debtor's obligations under the bonds, except perhaps to change the entities to whom they are owed.[1] The debtor received the benefit of the full $7 million proceeds of the bonds when they were issued, and after the change in the bondholders, it still owed the $7 million principal at the same interest rate as before the transfer. From the IRS's point of view, to the extent any symmetry is required, the bondholders' discount would be balanced against the loss

---

1. In fact, the debtor's obligations are probably owed directly to the bond trustee, Commerce, rather than the bondholders.

taken by Colonial, which presumably declared a loss to the extent of the discount.

The three cases the debtor relies on are *In re Chateaugay Corp.*, 109 B.R. 51 (Bankr.S.D.N.Y.1990), aff'd 130 B.R. 403 (S.D.N.Y.1991); *In re Allegheny International, Inc.*, 100 B.R. 247 (Bankr.W.D.Pa. 1989); and *In re Public Service Company of New Hampshire*, 114 B.R. 800 (Bankr. D.N.H.1990). Each case addressed the question whether certain discounts constituted unmatured interest not allowable under § 502(b)(2) because they were original issue discount or its equivalent; original issue discount is ordinarily defined as the difference between the face amount of bonds or debentures and the amount actually paid to the issuer for them. The *Chateaugay* decision was recently reversed by the Second Circuit. 961 F.2d 378 (1992). All three cases are distinguishable from this one because they concerned transactions involving the debtors themselves, a necessary prerequisite to the occurrence of original issue discount. Here, the transaction was simply a market sale by one bondholder to others without any action by the debtor. *Public Service* is further distinguishable because it concerned only debentures issued for cash which had a stated face amount greater than the actual price paid for them, that is, ordinary original issue discount. 114 B.R. at 801. Unlike the debtor here, Public Service Company never obtained the use of the full face amount of the debentures. *Allegheny* is further distinguishable because it concerned debt instruments the debtor gave in exchange for preferred stock. 100 B.R. at 248–49 and 252 n. 8. Thus, Allegheny International exchanged equity for debt, effecting a substantial change in its balance sheet. The most relevant portion of *Chateaugay*, concerning a debt-for-debt exchange (rather than a relatively uncontroversial portion that dealt with ordinary debt-for-cash original issue discount), is more analogous to this case than the other two cases because it at least involved a situation where the debtor owed a debt obligation both before and after the transaction in question. The debtor argues the market discount involved here should be

treated like original issue discount for purposes of § 502(b)(2).

The debtor acknowledges it is seeking to expand the bankruptcy court's holding in *Chateaugay* beyond debtor transactions to market transactions involving only third parties which have no direct impact on the debtor itself. In reversing the bankruptcy court's decision, the Second Circuit reasoned as follows:

The question is whether a face value exchange generates new [original issue discount (OID)]. The bankruptcy court, in an opinion endorsed by the district court, held that it does. The court reasoned that, by definition, OID arises whenever a bond is issued for less than its face amount, and that in LTV's debt-for-debt exchange, the issue price of the New Notes was the fair market value of the Old Debentures. The court therefore concluded that the New Notes were issued at a discount equaling the difference between their face value and the fair market value of the Old Debentures. [Citation omitted.]

The bankruptcy court's reasoning leaves us unpersuaded. While its application of the definition of OID to exchange offers may seem irrefutable at first glance, we believe the bankruptcy court's logic ignores the importance of context, and does not make sense if one takes into account the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition. [Citations omitted.] If unamortized OID is unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy. We must consider the ramifications of a rule that places a creditor in the position of choosing whether to cooperate with a struggling debtor, when such cooperation might make the creditor's claims in the event of bankruptcy smaller than they would have been had the creditor refused to cooperate. The

bankruptcy court's ruling places creditors in just such a position, and unreversed would likely result in fewer out-of-court debt exchanges and more Chapter 11 filings. Just as that ruling creates a disincentive for creditors to cooperate with a troubled debtor, it grants a corresponding windfall both to holdouts who refuse to cooperate and to an issuer that files for bankruptcy subsequent to a debt exchange. [Citation omitted.]

The bankruptcy court's decision might make sense in the context of a fair market value exchange, where the corporation's overall debt obligations are reduced. In a face value exchange such as LTV's, however, it is unsupportable. LTV's liability to the holders of the New Notes was no less than its liability to them had been when they held the Old Debentures. The bankruptcy court, by finding that the exchange created new OID, reduced LTV's liabilities based on an exchange which, because it was a face value exchange, caused no such reduction on LTV's balance sheet.

We hold that a face value exchange of debt obligations in a consensual workout does not, for purposes of section 502(b)(2), generate new OID. Such an exchange does not change the character of the underlying debt, but reaffirms and modifies it. [Citations omitted.]

In the absence of unambiguous statutory guidance, we will not attribute to Congress an intent to place a stumbling block in front of debtors seeking to avoid bankruptcy with the cooperation of their creditors. Rather, given Congress's intent to encourage consensual workouts and the obvious desirability of minimizing bankruptcy filings, we conclude that for purposes of section 502(b)(2), no new OID is created in a face value debt-for-debt exchange in the context of a consensual workout. Thus, OID on the new debt consists only of the discount carried over from the old debt, that is, the unamortized OID remaining on the old debt at the time of the exchange.

961 F.2d at 382–83. The debtor's requested extension of the lower court's holding would interfere not with exchanges a debtor wishes to make after issuing bonds or debentures but with the bond or debenture holders' ability to liquidate their investment when the issuer's financial condition deteriorates. Potential buyers from bond or debenture holders would be more hesitant to buy knowing their claims would be reduced in bankruptcy to the price they paid plus interest to the time a bankruptcy petition is filed instead of being allowed at the original issue price, and so would offer even lower prices or decline to buy at all. Consequently, original issue prices might also be deflated to reflect the fact creditors could not expect to be able to unload their bonds or debentures. In addition, a debtor which had received the full benefit of the original issue of the bonds would also receive a substantial windfall simply by filing for bankruptcy even though the transaction had no effect outside bankruptcy on the debtor's obligations under the bonds. The Court concludes these cases provide no support for the debtor's position, especially now that the bankruptcy court's *Chateaugay* decision has been reversed.

The Court is likewise not convinced by the debtor's appeal to equity. The bond claim would clearly have been allowable in the full face amount of the bonds if Colonial had retained the bonds, and the other creditors would have had no ground for complaint. Reducing market bond buyers' claims to the amount they paid for the bonds would simply reduce, if not eliminate, the price they might have paid to the current bondholder, and this would inequitably restrict that bondholder's ability to cut its losses. The purchase price here reflects Colonial's desire to recoup some of its investment and avoid the risks, costs and delays it would have experienced in seeking to enforce its full claim. The bondholders were simply willing to assume those burdens in hopes of collecting significantly more than the purchase price. The other creditors could presumably have tried to buy the bonds themselves if they wished to take on those burdens in return for the possible pay-off. The Court believes the debtor's theory would simply provide an undeserved windfall to the debtor and its

creditors. The bondholders have done nothing inequitable.

## B. CHAMPERTY

██ The debtor's belated assertion of champerty arose from the South Dakota Supreme Court's recent decision determining that the common-law doctrine of champerty is currently recognized in that state. *McKellips v. MacKintosh,* 475 N.W.2d 926 (S.D.1991); *but see concurring opinion, 475 N.W.2d at 930 ("While I do not disagree that the contract ... violates public policy and is therefore unenforceable [citation omitted], I do not believe this court needs to dredge up antiquated common-law doctrines such as 'champerty and maintenance' to make this conclusion.").* In reaching its decision, the court relied extensively on discussions of champerty and maintenance contained in *American Jurisprudence Second* and *Corpus Juris Secundum.* This Court has found the following discussions in the same sources:

> Although it has been stated that one cannot sell a lawsuit, it is generally accepted that the bona fide purchaser or assignee of a mere right of action is not guilty of champerty, maintenance, barratry, or a violation of public policy, except in cases where the rule has been changed by statute ..., or except under some, although not all, authority, where the cause of action assigned arose [from a tort rather than a contract.]

14 *C.J.S.* Champerty and Maintenance § 5 (1991).

> The common-law doctrine of champerty and maintenance has been relaxed so that the bona fide assignee of a chose in action or of a judgment can generally sue in any court of law or equity, the defendant retaining all legal or equitable defenses that he might have asserted against the assignor. And the fact that the assignment is made after suit was instituted on the claim does not render the assignment champertous.

14 *Am.Jur.2d* Champerty and Maintenance § 10 (1964). In McKellips, the court quoted the following definition of champerty: "Champerty, a form of maintenance, in- volves an agreement under 'which a person who has no interest in the suit of another undertakes to maintain or support it at his own expense in exchange for part of the litigated matter in event of a successful conclusion of the cause.' [Citations omitted.]" 475 N.W.2d at 928–29. Given this definition and the general statements from C.J.S. and Am.Jur.2d, the Court believes the South Dakota court would not view the bondholders' purchase of the bonds as champertous. For whatever reason, champerty does not apply to complete assignments or sales. So far as the evidence showed, the bondholders took over all rights previously held by Colonial and have no obligation to share with it any of their ultimate recovery. The debtor's inventive champerty claim must fail.

## C. CONCLUSION

For these reasons, the Court concludes that (1) the market discount obtained by the bondholders is not interest under 11 U.S.C.A. § 502(b) and the debtor's attempt to reduce the lien on its hotel by the market discount must be denied, and (2) the debtor's champerty objection to the bondholders' claim must be overruled.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure.

## ON MOTION TO ALTER OR AMEND OR FOR NEW TRIAL

This proceeding is before the Court on the debtor-plaintiff's motion to alter or amend the judgment entered on July 10, 1992, or for a new trial. The debtor-plaintiff appears by counsel Daniel D. Phillips and Cynthia F. Grimes of Lewis, Rice & Fingersh. The defendants appear by counsel Jan Hamilton and Leon B. Graves of Hamilton, Peterson, Tipton & Keeshan.

## SUPPLEMENTAL FINDING OF FACT

Based on the evidence presented, the Court finds that the defendant bondholders did not purchase the bonds with the sole purpose of instituting litigation. It is clear

they simply wanted to obtain either (1) the full face amount of the bonds, if the debtor could pay it, or (2) the property securing the bonds for less than they believed its market value to be. In the event the debtor could not pay, the bondholders would undoubtedly have been more than happy to receive the property from the debtor without litigation if possible, and would certainly not have insisted on suing the debtor despite its willingness to turn the property over. In fact, although they bought the bonds in February of 1990, they had not sued the debtor as of the time it filed for bankruptcy on July 11, 1991. *See pleading 6, Statement of Financial Affairs of Debtor Engaged in Business, ¶ 12.* It is somewhat ironic that the debtor, which itself brought the bondholders into court by filing for bankruptcy and commencing this adversary proceeding, now claims the bondholders were the parties wishing to litigate about the bonds.

### CONCLUSIONS OF LAW

The debtor contends the Court erred in determining the doctrine of champerty bars only the assignment of part of a claim, rather than the assignment of the whole of the claim. The purpose of the doctrine, the debtor says, is to forbid assignments where the assignee's sole intent is to institute litigation. In the event this is true, the Court now reaches the further conclusion that the bondholders' purchase of the bonds was not champertous because they did not buy them with the sole intent of bringing suit. The Court rejects the erroneous assertion made in the debtor's reply brief which first raised the champerty question that, "The means [by] which a mortgage holder acquires the mortgaged property is through litigation." The Court is well aware a mortgage holder might obtain its collateral through the debtor's agreement without litigation. The Court is also certain the bondholders would not have been disappointed if the debtor had paid off the bonds in full and kept the hotel property for itself.

The debtor has stated no grounds for granting a new trial other than the alleged error of law noted above.

The Court therefore adheres to its prior ruling, as thus supplemented. The debtor's motion to alter or amend or for a new trial is hereby denied.

IT IS SO ORDERED.