**In re I.C.H. CORPORATION, a Delaware Corporation, f/k/a Southwestern Life Corporation, f/k/a I.C.H. Corporation, Debtors.**

**In re SWL HOLDING CORPORATION, a Delaware Corporation f/k/a Life Interests Corporation, Debtors.**

**In re FACILITIES MANAGEMENT INSTALLATION, INC., a Delaware Corporation, Debtors.**

**In re CARE FINANCIAL CORPORATION, a Delaware Corporation, f/k/a Health Interests Corporation, Debtors.**

**Susan A. BROWN As Managing Trustee of the Lone Star Liquidating Trust, Plaintiff,**

v.

**Victor L. SAYYAH, Defendant.**

**Bankruptcy Nos. 395–36351 RCM–11 to 395–36354. Adversary No. 97–3119.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

March 6, 1998.

Bobbie T. Shell, Baker & Botts, Dallas, TX, for Defendant.

Ronald B. Krakow, Gibson, Dunn & Crutcher, Dallas, TX, for Plaintiff.

## AMENDED MEMORANDUM OPINION

ROBERT C. McGUIRE, Bankruptcy Judge.

Summary judgment motions were heard in this case on October 28, 1997. Victor L. Sayyah ("Defendant") filed a motion for summary judgment against Susan A. Brown, as Managing Trustee of the Lone Star Liquidating Trust ("Plaintiff"), successor in interest to I.C.H. Corporation ("ICH" or "Debtor"). Plaintiff filed a response and cross motion for summary judgment ("Trustee's Cross Motion"). Following are the Court's findings of fact and conclusions of law under Bankruptcy Rules 9014 and 7052. An original opinion was entered herein on December 29, 1997; an order was entered on such summary judgments on December 29, 1997. Plaintiff timely filed a motion for reconsideration. Such motion is overruled for the reasons stated in this Amended Memorandum Opinion, which replaces the original opinion herein.

### Jurisdiction

The Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), (C), and (O).

### Applicable Summary Judgment Standard

Rule 7056 of the Bankruptcy Rules provides that summary judgment is appropriate if there is no genuine dispute over any material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56.

The summary judgment procedure is "an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (citing Fed.R.Civ.P. 1). Under Rule 56(c), brought forward in Bankruptcy Rule 7056(c), summary judgment is proper when the record establishes that no genuine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The substantive law will identify what facts are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *F.D.I.C. v. Southwest Motor Coach Corp.*, 780 F.Supp. 421, 422 (N.D.Tex. 1991). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1413 (5th Cir.1993) ("mere disagreement" between parties is not enough to create genuine dispute). "Stated another way, 'if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Epps v. NCNB Texas Nat'l Bank*, 838 F.Supp. 296, 299 (N.D.Tex.1993), *aff'd*, 7 F.3d 44 (5th Cir.1993) (quoting *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir.1991)). "However, all of the evidence must be viewed in the light most favorable to the motion's opponent." *Epps v. NCNB Texas Nat'l Bank*, 838 F.Supp. at 299, citing, *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 292 (5th Cir.1990). Once the movant has made a proper motion, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co.*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56. The nonmovant must raise more than a mere scintilla of evidence, and he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1356.

## Background Facts

On June 1, 1981, Sayyah Corporation, as seller, and American Commonwealth Financial Corporation ("ACFC"), as purchaser, entered into a stock purchase agreement (the "Stock Purchase Agreement") pursuant to which ACFC, through a to-be designated acquisition subsidiary, agreed to purchase Sayyah Corporation's controlling equity position in HCA, Inc. ("HCA") for $45,000,000, payable through (1) delivery of $15,000,000 in cash at closing and (2) execution of a twenty-year debenture in the face amount of $30,-000,000 bearing interest at a rate of ten percent (10%) per annum. At closing on October 15, 1981, the parties entered into a pre-closing amendment of the Stock Purchase Agreement, relating to the form, but not the amount or the interest rate of the debenture to be delivered pursuant to the Stock Purchase Agreement. HCA was a holding company owning and controlling life insurance companies domiciled in several states.

The $30 million debenture was secured by a $37,500,0000 letter of credit (the "Letter of Credit").

The parties spent the next several months after execution of the Stock Purchase Agreement obtaining necessary approvals, including filing for regulatory approval in those states in which the insurance companies controlled by HCA were domiciled. At a hearing before the insurance commissioner of the State of Colorado in August 1981, ACFC put on proof of its financial condition and explained the details of the transaction to the Commission, including the purchase price and the fact that ACFC was assuming long-term debt obligations to Defendant. The order entered by the Colorado insurance commissioner found, based upon ACFC's representations, that the shares of HCA were purchased for "consideration of $45,-000,000."

Upon ACFC receiving the necessary regulatory approvals, the parties closed the transactions under the Stock Purchase Agreement, as amended, on October 15, 1981, at which time the ACFC subsidiary which ACFC designated as the acquisition vehicle under the Stock Purchase Agreement paid Sayyah Corporation the $15,000,000 cash portion of the purchase price and executed and delivered a debenture to Sayyah Corporation in the amount of $30,000,000 bearing interest at the rate of 10% per annum as provided by the agreement. Under the terms of the Debenture, ALIC, the newly created subsidiary, was obligated to make interest payments at the 10% rate beginning with a payment of $1,375,000 on March 31, 1982, and continuing thereafter with payments of $3,000,000 annually until March 31, 2001. The $30,000,000 face amount of the Debenture was due in a single payment upon the maturity of the Debenture on October 15, 2001. The Original Debenture further provided that ICH could prepay the indebtedness evidenced thereby for a lesser amount, but only on one of three specific dates as follows: (1) October 15, 1986 for $24,125,000; (2) October 15, 1991 for $26,625,000; or (3) October 15, 1996 for $29,250,000. In each case ACFC was required to give one year's advance notice in writing of its intention to prepay the Original Debenture under these provisions.[1]

ACFC guaranteed the Original Debenture pursuant to a guaranty dated October 15, 1981 (the "Guaranty") and secured its Guaranty by an irrevocable letter of credit in the amount of $37,500,000 issued jointly by Chemical Bank, The First National Bank of Boston, and Mercantile National Bank of Dallas (the "Letter of Credit").

Sayyah Corporation subsequently assigned the Original Debenture, the Guaranty, and the Letter of Credit to Defendant, while ICH became the direct obligor under the Original Debenture by merger with ACFC.

In the fall of 1984, the parties negotiated an amendment of the Original Debenture at the request of ICH so that ICH could meet conditions imposed by lenders in order for ICH to obtain $368 million in financing in connection with ICH's proposed acquisition

---

1. The October 15, 1986 prepayment amount of $24,125,000, plus the scheduled interest payments for 1982—$1,375,000 (a partial year), 1983—$3,000,000, 1984—$3,000,000, 1985—$3,000,000, and 1986—$3,000,000, total $37,-500,000, the amount of the Letter of Credit.

of several other insurance companies. Through this amendment, finalized on October 29, 1984, the parties amended the Original Debenture by entering into a document entitled Amendment No. 1 to Subordinated Debenture (the "Amended Debenture"). Under the Amended Debenture, Defendant released ACFC from its Guaranty and released the Letter of Credit securing the Guaranty. In consideration for Defendant's agreement to the Amended Debenture, ICH relinquished its right to prepay the Original Debenture at an amount less than the face amount of the Original Debenture and, as substitute collateral in lieu of the Letter of Credit, agreed to loan Defendant up to $29,500,000 under a revolving credit loan agreement dated October 29, 1984 (the "Revolving Credit Agreement"), from which Defendant since has drawn loans in the aggregate amount of $27,000,000. The parties timed the loans under the Revolving Credit Agreement so that the loans under the agreement would be due and payable October 15, 2001, the same date on which the Amended Debenture was to mature.

On December 26, 1989, the parties amended the Revolving Credit Agreement by entering into an Amendment No. 1 to Revolving Credit Agreement (collectively, with the Revolving Credit Agreement dated October 29, 1984, the "ICH Loans"). This amendment changed the dates on which Defendant was to make interest payments on account of the ICH Loans to correspond to the dates on which ICH was to make interest payments to Defendant on account of the Amended Debenture. At no time since December 26, 1989 did either party make payment to the other of the entire amount of the interest payment due on March 31st of each year under the Amended Debenture and the ICH Loans, respectively. Instead, on March 31st of each year thereafter until commencement of ICH's bankruptcy case, ICH setoff the interest payment due with respect to the ICH Loans against the interest payment owed under the 1984 Amended Debenture and remitted only the excess to Defendant.

ICH merged with ALIC, thereby taking the obligations and rights under the Debenture and recorded it on their books at $17,153,000, using generally accepted accounting principles ("GAAP"), allegedly because of the alleged sub-market stated interest rate.

ICH commenced its chapter 11 case on October 10, 1995. On Schedule D of the schedules and statements filed with the Court, in accordance with Federal Rule of Bankruptcy Procedure 1007, ICH scheduled Defendant's claim under the Amended Debenture in the amount of $31,250,000, of which ICH showed $28,064,835.63 was secured by right of setoff on account of the ICH Loans to Defendant and $3,185,165.00 constituted an unsecured claim.[2] Plaintiff, in her then capacity as an officer of ICH, likewise testified about Class 2 in ICH's plan, at the confirmation hearing, and stated: "Class 2 is what we consider the secured offset claim related to Victor Sayyah, and we've offset in the amount of approximately $28,000,000." (January 31, 1997 transcript at 68, lines 23–25). The liquidation analysis and projected balance sheet ICH offered as exhibits to the disclosure statement in respect of the plan similarly identified only net liabilities to Defendant on account of his unsecured claim, and ICH's balance sheet contained no references to any amounts owed by Defendant on account of the ICH Loans.

In the First Amended Disclosure Statement, ICH described Class 2 claims as:

ICH Class 2 consists of the Claim of Victor A Sayyah, which claim is based on a promissory note made by a predecessor of ICH with a current outstanding balance of approximately $30 million. The Debtors intend to file an objection to the Claim of Sayyah, and such claim is also subject to offset against an ICH loan to Sayyah with a current outstanding balance of approximately $27 million. The Debtors believe that, based upon their objection and the offset of Debtors' debt, no balance should be found by the Bankruptcy Court to be due to Sayyah. However, if any balance is found by the Bankruptcy Court to be due to Sayyah after giving effect to the offset,

2. In a footnote to Schedule D, ICH stated: "ICH does not admit the validity of any claim listed in this schedule and reserves the right to dispute the validity of any claim listed herein."

such balance shall be treated as an ICH Class 5 claim.

The Joint Plan provided for the classification and treatment of Defendant's § 553 claim as follows:

§ 3.1(a)(ii) ICH Class 2—Secured Claim of Sayyah. ICH designates as a Class Claim of Sayyah against ICH to the extent such claim is subject, pursuant to Sections 506(a) and 553 of the Bankruptcy Code, to offset against the debt owed to ICH by Sayyah. The remaining balance of such Claim, if any, to the extent such claim is an allowed claim, is and shall be treated as an ICH Class 5 Claim.

§ 4.1(a)(ii) ICH Class 2—Secured Claim of Sayyah. The Allowed Secured Claim of Sayyah shall be satisfied by an offset of the Allowed Amount of Sayyah's Claim against the amount of Sayyah's obligation to ICH.

On February 7, 1997, this Court entered the Order Confirming First Amended Joint Plan of Reorganization Under Chapter 11. Under that order, this Court authorized the conveyance by the Debtor to the Lone Star Liquidating Trust of the Debtor's right, title and interest in and to the obligations of Defendant to ICH. During the bankruptcy proceedings, Defendant has never attempted to seek relief from the automatic stay nor to permit setoff of his claim.

Under an economic analysis, using a market rate for the Debenture of 1990, as of the Petition date, ICH contends that the amortized value of the Debenture was $21,471,197. Defendant contends he is owed $30,000,000 in principle plus interest.

### Issue No. 1 on OID

Issue No. 1—Was the 1981 debenture issued with original issue discount ("OID"), such that, as of Petition Date, the face amount of the Amended Debenture actually included unmatured interest within the meaning of 11 U.S.C. § 502(b)(2)? A "debenture" is an unsecured obligation of a corporation which typically differs from a promissory note only in that the debenture is issued pursuant to a trust indenture to large numbers of investors. *Broad v. Rockwell*

*Int'l Corp.*, 642 F.2d 929 (5th Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *Security Pac. Nat'l Bank v. Resolution Trust Corp.*, 63 F.3d 900 (9th Cir.1995); *Shamrock Oil & Gas Co. v. Campbell*, 107 F.Supp. 764, 766 (N.D.Tex. 1952). The promissory note in question here, in contrast, was not issued pursuant to a trust indenture for the purpose of raising capital (as in the case of a "debenture"), but was issued "to one or a few purchasers pursuant to a purchase or loan agreement." *Broad v. Rockwell*, 642 F.2d at 941 n. 12.

Defendant's claim arises from a note or "debenture" issued in 1981 pursuant to a Stock Purchase Agreement. At the closing of the transaction covered by the agreement, Defendant delivered to ICH two-thirds of the outstanding shares of stock of HCA, and ICH delivered to Defendant $15 million in cash and the $30 million note, for the agreed-upon total consideration of $45 million. The note provides that it is governed by Illinois law. Illinois law governing the collection of a note appears to mirror the general contract law principles found in Texas and other jurisdictions.

### What is OID?

Frequently, a bond sells on the open market for a price that is less than the face value of the instrument. When this happens at the initial offering of a debenture, it is said that the instrument was issued at a discount, referred to as the "original issue discount" or "OID." Discounts on bonds and debentures are common when a bond is issued with an interest rate that is below the typical market rate. In order to make the instrument attractive to prospective purchasers, an issuer is required to adjust the purchase price and sell the instrument for less than its face price. This discount "compensates for a stated interest rate that the market deems too low." *In re Chateaugay Corp.*, 961 F.2d 378, 380 (2nd Cir.1992).

The amount of OID in such a transaction is equal to the difference between the bond's face amount (the stated amount of principal) and the proceeds, prior to issuance expenses, received by the issuer. For example, if a

note or debenture with a face value or principle value of $1000 is sold for $900, the $100 below the face value which the debenture sold for is OID. "The amount of the discount represents compensation to the Lender for the use and forbearance of money, i.e. interest." *Id; see also, United States v. Midland–Ross Corp.,* 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965) (treating OID for tax purposes as income, not capital). OID, therefore, is additional unstated interest on the principle.

### OID and § 502(b)(2)

■ Because OID is interest and not principle, it is important to consider the effects of § 502(b)(2) when a claim contains OID. Section 502(b)(2) allows a claim, "except to the extent that ... such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). "OID is amortized, for accounting and tax purposes over the life of the bond, with the face value generally paid back to the bondholders on the maturity date." *In re Chateaugay Corp.,* 961 F.2d at 380. The majority of cases have held that unamortized OID constitutes unmatured interest, therefore is it not an allowable claim under § 502(b)(2). *Id.* at 381; *In re Public Service Co. of New Hampshire,* 114 B.R. 800 (Bankr.D.N.H.1990). As stated in the *Public Service* opinion,

> The word "interest" in the statute is clearly sufficient to encompass the OID variation in the method of providing for and collecting what in economic fact is interest to be paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned.

*Id.* at 803. In a proof of claim based on a debenture, the proof of claim is to be allowed only to the extent that it does not encompass unamortized OID.

### Did the Original Debenture Contain OID?

If unamortized OID is not properly included in a proof of claim, then it is important to determine if Defendant's proof of claim contains OID. ICH argues that OID existed in the transaction because: 1) the interest rate, at 10%, was far below the prime rate of 18%; 2) the value of the HCA stock transferred was less than $30,000,000; 3) ICH characterized the debt on its books at a value of little over $17 million; and 4) ICH had the ability to pre-pay the debt obligation.

### A. Did the Low Interest Rate Have the Effect of Creating OID in the 1981 Debenture?

At the time the debenture was issued, the prime interest rate was 18%. (John W. Peavy, III ("Peavy") Affidavit). Peavy, ICH's expert, contends that the market rate for such debentures was 19%. Black's Law Dictionary 1191 (6th ed.1990) defines prime interest rate as:

> **Prime interest rate.** Usually defined as the lowest rate of interest from time to time charged by a specific lender to its most credit worthy customers *for short term unsecured loans.* The prime rate is often used as the floor or base rate for setting interest rates on other loans (*e.g.* consumer loans).

(Emphasis added).

In the traditional OID case, the purchaser of a $1000 debenture typically receives the debenture with a low interest rate for a discount in the purchase price, say $900. It is traditionally the discount in the purchase price that is the tip-off that OID exists in the purchase. ICH approaches the issue from the opposite end of the spectrum. ICH contends that the "ridiculously" low interest rate in this case—10% at a time when the prime rate was 18%—evidences the fact that the debenture was purchased at a discount. Based on Peavey's affidavit, ICH contends that the below market interest rate caused the principal amount of the debenture to be valued at $16,289,307, far less than its face value of $30,000,000.

Defendant responds that its use of the 10% interest rate was not unreasonable and does not reflect OID in the transfer. According to Defendant, he did not feel that the 18% interest rate would last long.

ICH and Defendant argue over how well secured the debenture was. As indicated, ICH took out a $37.5 million irrevocable letter of credit. Defendant contends that this provided them full protection while ICH says

that this only secured the principle plus the interest up through 1986.

■ ICH's analysis puts the cart before the horse. Usually, OID is created when the purchase price on the debenture drops relative to the principle amount because the interest rate on the debenture is too low. ICH contends that a low interest rate, in and of itself, creates OID. While there would be no problem finding OID if the low interest rate depressed the purchase price, absent evidence of a decrease in the purchase price, there is no basis for finding OID solely as a result of a low interest rate.

### B. Does the Alleged Value of the Stock, as Proposed by ICH, Reduce the Agreed Purchase Price of the Stock, Thereby Creating OID in the 1981 Debenture?

Plaintiff's second alternative reason to find OID is based on the alleged fair market value of the HCA stock. ICH argues that the market value of the stock at the time the sale was consummated was far below the stated purchase price, thus OID entered into the transaction. ICH, through Peavey's initial affidavit testimony, appeared to contend that, based on a market price of HCA stock of $9.50 per share, the market value of the HCA stock at the time of the stock purchase was only $17,977,087. As indicated, $15 million was paid in cash and there was a twenty-year debenture in the face amount of $30 million bearing interest at 10%. ICH contends that "OID is most evident when a debt instrument is issued for cash or publicly-traded property with less that the face value of the instrument."

■ Defendant responds that Peavey's "market value" assessment of the value of the stock and the debenture is inappropriate. Defendant's expert, Ms. Rogers, points out that determining the price that individual shares trade on the market does not adequately reveal the value of the stock purchase. For one thing, since Defendant was selling a 66.7% interest in HCA, that block was clearly a controlling interest in the corporation and would demand a control premium payment. Any stock quotation used to establish market value would be a quotation for a share of stock in the minority, thus the price of that share would be less to reflect that feature of the share. Additionally, using the market price of a share does not take into account the thin trading in HCA stock on the open markets. It is inappropriate in this case, therefore, to take the market price for minority shares of the stock on the date before the stock sale and characterize the value of the stock sale based on that number.

In Peavy's second affidavit, he stated:

1. In a previous affidavit, I stated the following:

   Based upon my review of the S & P Daily Stock Price Record, HCA, Inc. traded on the over-the-counter market in 1981, and closed at $9.50 per share bid on October 15, 1981.

2. Ms. Rogers responded to my above statement, as follows:

   It appears that Peavy's inference would be that that number of shares at the market price would have a value of about $18 million, rather than the $45 million stated in the transaction documents.

3. I adamantly object to Ms. Rogers' interpretation of my above statement. In no way did I infer that the value of the acquisition of HCA stock by ICH was valued at "about $18 million." I only stated a simple fact for the record.

4. In fact, I agree with Ms. Rogers that a "control block" of stock often carry a premium over the quoted market price. A substantial amount of empirical research confirms the existence of control premium.

5. However, the $45 million transaction value supported by Ms. Rogers' opinion represents an unrealistically high premium of almost 200% in excess of the market price. Only in exceptionally rare instances would a control premium be this large.

Peavy's affidavits do not specifically give an opinion on when such "exceptionally rare instances" occur.

No bankruptcy case has ever dealt with the valuation of securities exchanged in a

debt-for-equity purchase for the purpose of determining OID. Both *In re Chateaugay Corp.*, 961 F.2d at 380, and *Matter of Pengo Indus., Inc.*, 962 F.2d 543, 550 (5th Cir.1992), *cert. denied, Licht v. Texas Commerce Bank*, 506 U.S. 1000, 113 S.Ct. 602, 121 L.Ed.2d 538 (Nov. 30, 1992), emphasized that they did not need to decide the issue of whether OID arises from a debt for equity exchange.

The Second Circuit further pointed out in *In re Chateaugay Corp.* that it did not have to decide whether *In re Allegheny Intern., Inc.*, 100 B.R. 247 (Bankr.W.D.Pa.1989), was properly decided. *In re Allegheny* was a debt for equity exchange, not a debt for equity purchase, where the court found OID in the transaction. *In re Allegheny*, even if correctly decided, is clearly distinguishable on its facts. The prospectus in that case anticipated that the issuance of 10.4% debentures would create OID (*Id.* at 248), and the issue price of the debentures would equal the first price at which such debentures traded on the New York Stock Exchange following their issuance (*Id.* at 248), *i.e., In re Allegheny* involved a pre-bankruptcy exchange of new debentures for old preferred stock and concluded that the OID in the new debentures, for bankruptcy purposes, is determined by reference to the debentures' trading price following their issuance. Gary B. Wilcox and David M. Rievman, *Restructuring Troubled Debt Under the New Debt Exchange Rules*, 10 Va. Tax Review 665, 669 n. 28 (Winter 1991). The *Allegheny* court also relied heavily by analogy on cases involving the Tax Code, an approach which both *Chateaugay* [3] and *Pengo* [4] reject. It is important to note, however, that *Chateaugay* and *Pengo* were consensual workout cases where financial arrangements were being made to attempt to prevent a company form going into bankruptcy. The instant case is not a workout case, rather it was a stock purchase agreement. The policy arguments behind the

workout cases which formed the basis of those opinions are not applicable here.

The *Pengo* court described the holding by the bankruptcy court in *Chateaugay* as follows:

> The [*Chateaugay* bankruptcy] court reasoned that the fair market value of the "property given up in the exchange transaction"—the old debentures—constituted the proper measure of the issue price of the new notes.[5]

*Pengo* at 548 (Emphasis added). By overruling the Bankruptcy Court, the Second Circuit disregarded, on policy grounds, fair market value as the proper benchmark for determining the values exchanged.

ICH, in their 10–K report for fiscal year ending December 31, 1981 (Defendant's Supplemental Ex. 2, p. 10), stated that the arm's length purchase price of the HCA stock it received from the sale was $45 million dollars. Specifically, the 10–K states:

> The purchase price for the 1,892,325 HCA shares, which was determined by arm's length negotiations between ACFC and Sayyah, was $45,000,000 or $23.78 a share.... Purchaser paid $15,000,000 of the purchase price in cash at the closing ... purchaser paid the balance of the purchase price by delivering its $30,000,000 subordinated debenture to Sayyah.

Before Sayyah and ACFC, ICH's predecessor, could proceed with the transaction, they needed to receive approval from several regulatory agencies. On August 26, 1981, a public hearing was held by the Colorado Commissioner of Insurance. As a result of the hearing, the Commissioner entered as a finding of fact:

> ACFC [ICH's predecessor in interest], through one of its subsidiaries, proposes to purchase approximately 1,892,325 shares, consisting approximately of 66 percent of the issued and outstanding shares of Holding Corporation of America from the Sayyah Corporation for consideration of $45,-

---

3. 961 F.2d at 383.

4. 962 F.2d at 550.

5. In *Pengo*, 962 F.2d at 548 n. 4, the court pointed out that the Bankruptcy Court, in reaching such conclusion, "disregarded the value of the acquired stock in determining the value of the new notes; it compared the exchanged debentures with the acquired debt."

000,000. Consideration to be paid in the form of $15,000,000 at time of closing and promissory notes for the balance of $30,000,000 to be issued by the subsidiary directly acquiring said stock.

Although ICH is correct that this does not amount to a finding that the fair market value of the debenture was $30 million, it does illustrate that ICH either made or was aware that the representation had been made to the Colorado Commissioner of Insurance that the considerations exchanged in the transaction was $45 million dollars for the stock.

■ "[A] debt security is issued with OID to the extent its stated redemption price at maturity exceeds its *issue price.*" *Matter of Pengo Indus., Inc.*, 962 F.2d at 546, *citing* Nicholas P. Saggese, Gregg A. Noel & Michael E. Mohr, *A Practitioner's Guide to Exchange Offers and Consent Solicitations*, 24 Loy. L.A. L.Rev. 527, 548 n. 100(1991). (Emphasis added). Furthermore, OID is usually "deduced from a *purchase price* lower than the face value of the instrument." *Id.* (Emphasis added).

The debenture issue price or debenture portion of the purchase price was $30 million, which is the same as its redemption price at maturity. ICH did not establish by summary judgment evidence that the issue or purchase price of the debentures was less than such amount.

## POLICY CONSIDERATIONS

### 1. Reluctance of Circuits to Endorse Allegheny

As previously indicated, both the Second Circuit, in *In re Chateaugay Corp.*, 961 F.2d at 380, and the Fifth Circuit, in *Matter of Pengo Industries*, 962 F.2d at 550, were reluctant to rule that the debt for equity exchange case, *In re Allegheny Intern., Inc.*, 100 B.R. at 247, was correctly decided.

### 2. In Allegheny, Advance Public Knowledge of OID by Public and Parties Involved

In *Allegheny,* both the issuing/exchanging debtor and the purchasers knew, by virtue of the express disclosure to the public, that OID was a part of the contemplated transaction. This was not true in the current transaction. (*See,* Sayyah September 19, 1997 Supplemental Affidavit at pp. 3–4). No such contention or evidence was offered in this case. Open public pronouncements were that ACFC, ICH's predecessor, was paying $45 million, comprised of $15 cash and $30 million debenture for the HCA stock.

Furthermore, as indicated, this was a cash and debt for equity purchase, and not an exchange by a corporation of its equity for its debt or vice versa.

### 3. Tax Court Analysis Not Available as Analogy

The Allegheny court relied heavily, by analogy, on tax court authority. *Allegheny,* 100 B.R. at 251–254.

Both *Chateaugay* and *Pengo* hold, however, that reliance upon tax decisions for guidance in determining OID in the bankruptcy context is inappropriate. *Chateaugay* held that the considerations between a determination of OID under the tax code and under the bankruptcy code do not involve the same considerations since "[t]he same reasoning simply does not apply in the bankruptcy context." *Chateaugay,* 961 F.2d at 383. The Pengo court further explained:

> We stress that the tax treatment of original issue discount does not control our inquiry, which is placed firmly within the bankruptcy framework.... While we might consider the tax treatment of a transaction persuasive authority in determining the bankruptcy treatment of that transaction, the tax rules applicable to a transaction certainly do not circumscribe those devised in bankruptcy. The bankruptcy system revolves around the policy that all creditors who are similarly situated are entitled to fair and equitable treatment. The tax system, however, usually requires that whenever a "realization event" has occurred and the taxpayer can measure the amount of realizable gain or loss, the taxpayer must include the consequences of that transaction in calculating the taxpayer's income. Just because an exchange offer may constitute a realization

event justifying the taxation of the participants, it does not follow that the transaction demands a corresponding transformation in the relationship of similarly situated creditors.

*Pengo,* 962 F.2d at 550. (citations omitted). This court finds the reasoning of the Second Circuit and Fifth Circuit compelling and controlling. As such, tax cases that express how OID should be treated will not be controlling, by analogy.

### 4. The Debenture in This Case Was Not Publicly Traded and Alleged OID is Attempted To Be Created From Eighteen–Year–Old Hindsight

In the present case, the $30 million 1981 debenture was not publicly traded (Opinion at 8), therefore, there was, and is, no ready public market for its valuation. Attempted market reconstruction now would involve considerable reconstruction expense and speculation, and, by extension of such an approach, jeopardize everyday purchase and sale transactions, and markets.

Policy-wise, is it not more equitable to relegate a debtor with these type of facts to the fraudulent conveyance remedies, with their reasonable statutes of limitation, rather than creating the specter of twenty-year OID with no advance knowledge? *See,* 11 U.S.C. § 548; *In re Roco Corp.,* 701 F.2d 978 (1st Cir.1983); *Stoumbos v. Kilimnik,* 988 F.2d 949, 965 (9th Cir.1993); *Matter of Dunham,* 110 F.3d 286 (5th Cir.1997).

This contention of Debtor is overruled.

### C. Does the Value of the Debenture as Reflected on ICH's Books Create or Evidence OID in the transaction?

ICH argues that evidence that the debenture was not worth $30,000,000 can be found by looking at ICH's books. On the books, "based on the sub-market rate and the implied OID" ICH recorded the value of the debenture in accordance with "generally accepted accounting principles" ("GAAP") at $17,153,000. The standards promulgated by the Financial Accounting Standards Board have "detailed guidelines to force the issuer and purchaser to reflect the underlying eco-nomic substance of original issue discounts." *In re Public Service,* 114 B.R. at 802. Because " 'interest' in § 502(b)(2) must mean interest from the debtor's point of view," *In re Mt. Rushmore Hotel Corp.,* 146 B.R. 33, 34 (Bankr.D.Kan.1992), ICH contends that ICH's booking of the Debenture in compliance with GAAP at $17,153,000 is further evidence that the Debenture was issued with OID.

Defendant contends that the entry of the stock on the books is dispositive of nothing. ICH's purpose in devaluing the debenture on the books was based on other considerations. James Melville, ICH's Senior Vice President of Finance stated:

> During the relevant time period, ICH was an acquirer of other companies and frequently borrowed money in order to finance its acquisitions. As such, it was very important to ICH's future purchases of companies and requisite borrowings that the purchase of HCA be shown on the financial statement of ICH as favorably as possible. By discounting all future payments due on the Debenture using the effective rate of 18%, ICH was able to show a reduced amount of liabilities on its financial statements and thus was able to improve its debt/equity ratio.

> There was never any discussions of original issue discount at the time the Debenture was booked at a discount. The entire discussion was centered on how aggressively the Debenture could be devalued.

Additionally, use of GAAP does not ensure that the single, "correct" accounting of the debenture on the books was made. The Supreme Court stated:

> Accountants have long recognized that "generally accepted accounting principles" are far from a canonical set of rules that will ensure identical accounting treatment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments, leaving the choice among alternatives to management.

*Thor Power Tool Co. V. Comm'r of Internal Revenue.* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). Since GAAP can be

approached from the standpoint of a range of reasonable treatments in making the assets and liabilities of a corporation appear more or less favorable depending on the legitimate management purpose at hand, it is inappropriate to draw the conclusion that the representation of the Debenture on the books is, *per se,* the true representation of its purchase price.

### D. Did the Prepayment Rights Establish OID in the Transaction?

ICH argues that the terms of the Debenture "conclusively evidence a discounting on the face value by virtue of the fact that ICH had the right to prepay the entire $30,000,-000 stated principal for $24,500,000, $26,625,-000 or $29,125,000 on the fifth, tenth and fifteenth anniversary dates, respectively." They conclude that "it cannot be disputed that on those anniversary dates and all times prior to maturity the value of the Debenture was less than the face amount of $30,000,-000." In each case of prepayment, ICH was required to give one year's advance notice of its intention to prepay the Original Debenture under these provisions.

However, supposed value, on a permitted prepayment date, is not an OID issue. The OID issue is a lower issue or purchase price, as compared to a redemption price at "maturity."

As previously stated: "[A] debt security is issued with OID to the extent its stated redemption price at maturity exceeds its issue price." *Matter of Pengo Indus., Inc.,* 962 F.2d at 546, *citing* Nicholas P. Saggese, Gregg A. Noel & Michael E. Mohr, *A Practitioner's Guide to Exchange Offers and Consent Solicitations,* 24 Loy. L.A. L.Rev. 527, 548 n. 100 (1991). Webster's Third New International Dictionary 1395 (1993) defines maturity as "...a becoming due: termination of the period that a note or other obligation has to run...." Black's Law Dictionary 979 (6th ed.1990) defines "Maturity date" as "The date on which the principal amount of a note, draft, acceptance, bond, or other debt instrument becomes due and payable."

ICH cites to no case law which indicates that "prepayment" enters into any formula by which OID is computed.

Additionally, Defendant, through the affidavit of Price Waterhouse, argues that ICH's argument overstates the economic significance of the rights to the prepayments. Even assuming that ICH had exercised the prepayment right, Defendant argues that at the most, ICH would have incurred an economic discount of 1.76% to 1.93%. Furthermore, ICH never used the right to prepayment and it agreed in 1984 to eliminate the right to prepayment.

At no time could ICH actually have prepaid this loan. The stock purchase sales agreement allowed ICH to pay off the loan for an amount less than the principle on the fifth, tenth, and fifteenth anniversary of the transaction. However, before the fifth anniversary, and in 1984, the parties agreed to a modification eliminating those prepayment rights. Therefore, although ICH held the right to prepay the loan for a discounted amount in the future, by the third year of the agreement, that right had not yet accrued and was, in fact, removed from the agreement by the 1984 amendments. As a result, ICH never had the right to pay off the debenture at a discount. However, if OID existed in the 1981 debenture, it could be theoretically brought forth in an amendment even though the offensive provision was removed. *In re Chateaugay Corp.,* 961 F.2d at 383–384; *Matter of Pengo Indus., Inc.,* 962 F.2d at 547 n .3. As indicated, the existence of any prepayment rights, until the 1984 amendments, did not create OID because prepayment is not part of the formula by which OID is computed.

### The 1984 Amendments

ICH based its OID argument on the 1981 debenture as containing OID which was not removed by the 1984 amendments, which allegedly merely amended the Original Debenture. *Chateaugay,* 961 F.2d at 383–384; *Pengo,* 962 F.2d at 547 n. 3. Since the Court has found no OID in the 1981 debenture, then the 1984 amendments need not be extensively addressed.

ICH does not contend that the 1984 amendment, standing alone, created OID.

Defendant's motion for summary judgment is granted in part.

There was no summary judgment evidence establishing OID in the $30 million debenture.

### Remaining Issues on Setoff

Issue No. 2—Whether setoff occurred pre-petition, on petition date (October 15, 1996), or on February 15, 1997, the agreed date of effectiveness of the confirmed plan.

Issue No. 3—Whether ICH is estopped to claim postpetition interest from Defendant.

Issue No. 4—After properly applying setoff, what is the present balance of any net existing claim of either party?

Neither party disputes the fact that, except for the questioned date of any setoff, this is the type of debt for which setoff is appropriate. *See,* 5 *Collier on Bankruptcy* ¶ 553.01 (15th ed. rev.1997), setting forth the four conditions required for setoff.

Amendment No. 1 to the Revolving Credit Loan Agreement dated as of October 29, 1984, was entered into as of December 26, 1989 and provided in part as follows:

4. Section 10 shall be added to the Agreement and shall read as follows:

10. *ICH shall have the right, but not the obligation, to set off any and all amounts due from Sayyah, under this Revolving Credit Loan Agreement and the Notes, against the amounts payable by ICH.*

5. The prior Events of Default in the payments of interest by Sayyah to ICH and Modern American Life Insurance Company during 1989 are hereby waived, but that waiver shall not constitute a waiver of any other default of Event of Default past, present or future.

6. All other terms and provisions of the Revolving Credit Agreement dated as of October 29, 1984, except as specifically amended herein, shall be applicable hereto and shall remain in full force and effect.

(Emphasis added).

As previously indicated, on March 31 of each year after 1989, until commencement of ICH's bankruptcy, ICH set off the interest payments due with respect to ICH loans to Defendant against the interest payment owed by ICH under the 1984 Amended Debenture and remitted only the excess to Defendant.

Plaintiff contends that Defendant's right to set off his obligations to Plaintiff against Plaintiff's obligations to Defendant should be deemed to have occurred February 15, 1997, rather than the petition date of October 10, 1995 or prior to the petition date. The net result of this position would be as follows: Defendant would be liable to Plaintiff for postpetition interest on his entire loan,[6] while, at the same time, under § 502(b)(2), Defendant would not be able to collect postpetition interest from Plaintiff on the debenture. However, if setoff is construed to have occurred at the petition date, as Defendant contends, then Defendant would not be liable for any postpetition interest payments on the loan since the setoff would fully extinguish Defendant's obligation on the loans from ICH. Under this latter scenario, Defendant would end up with an unsecured claim in the ICH estate of approximately $3,185,165.

Defendant contends that setoff occurred at or about petition date by reason of 11 U.S.C. § 502(b)—"if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition,* and shall allow such claim in such amount...." *Id.* (Emphasis added).

As previously indicated, Defendant filed his proof of claim on January 31, 1996. This adversary, filed April 21, 1997, was the first means by which a formal objection was made to the claim of Defendant by ICH. Reference is made to the plan and disclosure statement's discussions of such claim. Defendant filed a counterclaim against Plaintiff in effect urging the merits of its claim as filed. Prior

---

6. *In re Patterson,* 143 B.R. 961, 964 (Bankr. M.D.Fla.1992).

to such formal objection, the claim of Defendant had *prima facie* validity. Bankruptcy Rule 3001(f).

In support of its § 502(b) statutory argument date, Defendant cites to *In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1342 (5th Cir.1984), for the proposition that the petition date should be controlling because such construction is "supported by the historical reasons that view the petition-date as the fictitious date on which the debtor's assets are to be ratably distributed among the creditors," as well as being "the most fair … and most administratively efficient general methodology for determining" the unsecured claims in this case. *Id.* For the same general proposition, Defendant also cites *In re O.P.M. Leasing Services, Inc.*, 79 B.R. 161 (S.D.N.Y.1987).

### The Right of Setoff in Bankruptcy

■ Setoff rights in bankruptcy cases are governed by §§ 553 and 506 of the Bankruptcy Code. Section 553(a) of the Bankruptcy Code preserves the right of setoff and provides that, except for the automatic stay and certain other limited exceptions, "this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a). Section 506, in turn, provides that a creditor with setoff rights is treated as having a secured claim against the debtor's estate to the extent of the amount subject to setoff. 11 U.S.C. § 506(a). The effect of bankruptcy is not to defeat right of setoff, but merely to delay its enforcement pending an orderly determination of respective rights of debtor and creditors. *In re Freeborn*, 100 B.R. 474 (Bankr.E.D.Mo.1989). In *In re Pieri*, 86 B.R. 208, 210 (9th Cir. BAP 1988), the court stated:

> Historically, setoff has been permitted in courts of equity *Federal Deposit Ins. Corp. v. Bank of America*, 701 F.2d 831, 836 (9th Cir.1983). Under the Bankruptcy Act, the right of setoff was generally favored, although not automatically permitted. *See Melamed v. Lake County Nat. Bank*, 727 F.2d 1399, 1404 (6th Cir.1984). In general, setoffs are allowed in bankruptcy to the extent that they are based upon mutual obligations existing between the debtor and a creditor, based on a concept of fairness, in order to prevent injustice. *See In re Handy*, 41 B.R. 172, 174 (Bankr.E.D.Va. 1984); *In re Republic Financial Corp.*, 47 B.R. 766, 768 (Bankr.N.D.Okla.1985).

Plaintiff argues that, according to *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258; 5 *Collier on Bankruptcy* ¶ 553.05[1] (15th ed. rev.1997), Defendant did not take all the necessary steps to effect a setoff. In *Strumpf*, the Supreme Court was considering whether a bank violated the automatic stay by placing an administrative hold on funds in a bank account against which it claimed the right to setoff. The court held that the bank did not violate the automatic stay because its intent was not to permanently deprive the Debtor of the funds. Rather, the bank was just ensuring the status quo until the courts could decide the rights of the parties. The court said:

> A requirement of such an intent is implicit in the rule followed by a majority of jurisdictions addressing the question, that a setoff has not occurred until three steps have been taken: (i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff.

*Id.* at 19, 116 S.Ct. at 288. According to the court, the state law is the law that governs the requirements of setoff, "but even if state law were different, the question whether a setoff under § 362(a)(7) has occurred is a matter of federal law, and other provisions of the Bankruptcy Code would lead us to embrace the same requirement of an intent permanently to settle accounts." *Id.*

The court's three pronged test also prescribes two action elements that must accompany the mere desire to setoff claims: the act of effecting the setoff and the act of recording the setoff. As a result, the "intent" to setoff is not just the intent or desire to setoff, but also effecting the setoff and recording of the setoff.

*Strumpf* was specifically discussing setoff in the context of whether a potential stay violation occurred, as opposed to when the amount of a creditor's claim is to be determined.

In *Studley v. Boylston Nat'l Bank of Boston,* 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913); 5 *Collier on Bankruptcy* at 553–65, the Supreme Court explained some of the ways that setoff may be effected under state law. Setoff may occur if the parties have "given checks, charged notes, made book entries, or stated an account whereby the smaller obligation is applied on the larger." *Id.* See also, *Durham v. SMI Indus., Corp.,* 882 F.2d 881, 883 (4th Cir. 1989) (setoff effected prepetition by exchange of checks).

If a party delays a bookkeeping entry on suspended funds so as to avoid violating the automatic stay, then the non-booking of the entry would not be determination of whether and attempted setoff had occurred. *In re Price,* 134 B.R. 313, 318 (Bankr.N.D.Ill.1991).

For a postpetition setoff on a prepetition claim against the debtor, the creditor generally must obtain a lift of the stay. § 362(a)(7). The stay would not apply to a debtor's postpetition setoff. Postpetition actions taken by a creditor, in violation of the stay, are voidable, not void. *Sikes v. Global Marine Inc.,* 881 F.2d 176 (5th Cir.1989).

In Defendant's proof of claim filed January 31, 1996 (Ex. 1 Plaintiff's First Response to Defendant's Motion for Summary Judgment), Defendant showed his claim as $30 million, plus interest and costs, and, in paragraph 6, the credits and setoffs column stated: "This claim is subject to a partial setoff." The automatic stay is not applicable to assertion of a claim in a proof of claim filed in a Bankruptcy Court. *In re North Coast Village, Ltd.,* 135 B.R. 641 (9th Cir. BAP 1992). However, positive further outside-of-court acts to assert such a setoff claim could violate the stay. *In re NTG Indus-*

*tries, Inc.,* 103 B.R. 195, 197 (Bankr.N.D.Ill. 1989); *In re Britton,* 83 B.R. 914, 919 (Bankr.E.D.N.C.1988); *In re Ketelsen,* 78 B.R. 573 (Bankr.D.S.D.1987), *aff'd in part, rev'd in part, on other grounds, U.S. v. Ketelsen,* 104 B.R. 242 (D.S.D.1988).

### Estoppel

In essence,[7] Defendant contends that, by the totality of Plaintiff's conduct, it should be estopped to contend that setoff did not occur prior to or at the time of ICH's petition or Plaintiff should be estopped from asserting a postpetition interest claim on Defendant's debt to Plaintiff.

Factors relied upon by Defendant include:

1. Schedule D of Debtor's schedules of assets (Ex. 8 to Defendant's First Affidavit) described more fully above, and referencing the Defendant's claim of $31,250,000 and saying it was subject to a setoff of $28,064,835.63 for loan from ICH to Defendant. (As previously stated, such schedules further said ICH does not admit the validity of any claim on the schedule and reserves the right to dispute it). See also, discussion on page 7 hereof referencing liquidation analysis, and balance sheet reflecting net liabilities to Defendant.

2. As previously described: Plaintiff's testimony, at the confirmation hearing, in her capacity as an officer of ICH, was that: "Class 2 is what we consider the secured offset claim related to Victor Sayyah and *we've offset in the amount of approximately $28,000,000.*" (Emphasis added). (Ex. 9 to Defendant's Motion for Summary Judgment at 68). Defendant contends such testimony, standing alone, shows ICH appears to have "made the decision," "taken action to accomplish," and "made a record of" the setoff previously and allegedly prepetition within the meaning of *Citizens Bank of Mary-*

---

7. While categorized generally by the court as estoppel, Defendant has generally cited cases to the effect that setoff is equitable in nature and should be applied by the courts consistently with the purposes and goals of the Bankruptcy Code. *Posey v. IRS,* 156 B.R. 910, 915 (W.D.N.Y.1993);

*In re Photo Mechanical Servs., Inc.,* 179 B.R. 604, 616 (Bankr.D.Minn.1995). See, *In re Handy,* 41 B.R. 172, 175 (Bankr.E.D.Va.1984), where the court discusses the opposite side of this issue, *i.e.,* finding no evidence to equitably estop the creditor from seeking setoff.

*land v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258.

3.  ICH's 10 K's filed with the SEC indicates that, based on ICH's "right to set off its obligation against the notes receivable" from Defendant, the "company's notes receivable have been reflected net of amounts due under the notes payable." (Defendant's Supplemental Appendix, Ex. 3A at 4).

4.  Defendant contends, in his Supplemental Affidavit, that, from ICH's court filings and communications from ICH he received either directly or through his counsel, he understood that the Revolving Credit Agreement and debenture would be enforced, not separately, but together, taking into account the offsetting amounts owed to him under the debenture. He further contends that this was consistent with the practice and course of dealings the parties previously had.

In paragraph 9 of his original affidavit, he outlined the parties' prior course of dealings as follows:

> 9.  On December 26, 1989, ICH and I amended the Revolving Credit Loan Agreement by entering into Amendment No. 1 to Revolving Credit Loan Agreement, which resolved certain disputes between the parties and further fine tuned the payment structure by providing that, not only would repayment of the principal under the Amended Debenture and ICH Loans both be due October 15, 2001, but that intervening interest payments also would be due at the same time each year. From that time forward, I did not make any interest payments directly to ICH on the ICH Loans. Instead what happened each year, was that on each March 31st, ICH would offset interest due under the Amended Debenture against my interest obligations under the ICH Loans, and remit the balance to me.

Fact issues exist with respect to Issues 2 through 4 referred to above. Except as granted, the parties' motions for summary judgment are denied. Plaintiff's motion for

reconsideration is overruled. Judgment will be entered in accordance with the foregoing amended opinion.